[No. D021086. Fourth Dist., Div. One. Jan. 29, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
SAMUEL L. DRAKE, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*This opinion is certified for publication with the exception of part I.

COUNSEL

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley and Annie Featherman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

McDONALD, J.—Samuel L. Drake (Drake) appeals a judgment convicting him of one count of grand theft (Pen. Code, § 487, subd. 1)[1], five counts of presenting false Medi-Cal claims (Welf. & Inst. Code, § 14107),[2] and one count of forging prescriptions (Bus. & Prof. Code, § 4390). Drake contends his convictions for grand theft and Medi-Cal fraud must be reversed because the statement on the claim forms he submitted that services were provided

---

[1]In 1993 Penal Code section 487, subdivision 1 was replaced by Penal Code section 487, subdivision (a). All references in this opinion to that statutory provision will be to Penal Code section 487, subdivision 1.

[2]All statutory references are to the Welfare and Institutions Code unless otherwise specified.

under his "immediate personal supervision" does not mean that he must be personally present when services are rendered by an employee. He also contends the doctrine of *People* v. *Bailey* (1961) 55 Cal.2d 514 [11 Cal.Rptr. 543, 360 P.2d 39] precludes convictions (1) on four of the five Medi-Cal fraud counts, and (2) on both grand theft and Medi-Cal fraud. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Drake is a physician who became a Medi-Cal provider in 1980. Medi-Cal is a state- and federally funded program which pays for health care services provided to individuals who are indigent, blind or disabled. When a Medi-Cal provider seeks payment for services rendered to these individuals, he or she submits a claim form which indicates, among other things, the services rendered, the date and place of service and the amount billed. The provider signs at the bottom of the form and certifies that he or she has read everything on the back of the form, including a statement that the services were personally rendered by the provider or by an employee acting under the provider's immediate personal supervision.

Drake employed Michael Dunlap (Dunlap), an unlicensed medical assistant, to work in his medical office. Dunlap routinely treated patients before 11 a.m. when Drake usually arrived at work. Dunlap diagnosed and treated patients and prescribed drugs for them. Drake instructed Lynette Lancia, his employee who answered the telephone and scheduled appointments, to schedule laboratory work, ear washes and Medi-Cal patients in the morning. Dunlap treated 90 percent of the Medi-Cal patients while Drake was not at the office site. Dunlap's actions in treating patients were authorized and directed by Drake.

From March 25 through April 6, 1992, Drake was on vacation in Rome, Italy. Before Drake left, he provided Dunlap with 50 to 75 presigned prescription forms to use while Drake was gone. Drake instructed Lancia that business would continue as usual while he was gone, with Dunlap seeing patients for minor illnesses, coughs, colds and sore throats. Dunlap did not have a telephone number, pager number, or other number at which he could contact Drake while Drake was out of the country.

On March 30, 1992, Lew Berkheimer, a State of California Attorney General's office investigator, posed as a Medi-Cal patient named Vanny Chou, visited Drake's office and asked to see a doctor. Dunlap saw her and asked about her symptoms, looked at her throat, used a stethoscope, checked her lungs and took a throat culture. Dunlap then gave her a prescription for antibiotics on a form signed by Drake before he left for Italy.

On March 24, 1992, Daniel Pierce, a mentally handicapped individual, was seen by Dunlap, who, after consulting with Drake, used a local anesthetic and scalpel to incise and drain an infected cyst on Pierce's scalp. On March 27, 1992 (while Drake was out of the country), Dunlap reopened Pierce's lesion with a scalpel.

On three other occasions while Drake was out of the country, Dunlap treated other patients (namely, Laquita Treher, Nicole Makaena and Joseph Jones).

Upon his return, Drake submitted claim forms for Medi-Cal payment of services rendered to these five individuals.

As a result of his actions, Dunlap was prosecuted and pleaded guilty to a misdemeanor. His education included high school and three months of training followed by six years of experience as a medical corpsman in the Navy.

At Drake's trial, Robert Korbalak, a physician-consultant for the State of California Department of Health Services, testified that an unlicensed medical assistant is a person who helps a physician perform his or her duties by draping a patient, preparing a patient for examination, taking biographical data and helping with the performance of simple tests such as electrocardiograms and vision tests. An unlicensed medical assistant cannot perform surgeries, give anesthetics, treat patients or prescribe medication, and is allowed to perform tasks only at the direction of a physician. Korbalak testified that all of the services billed pursuant to the five claim forms in question in this case were fraudulent, because they all required a physician to perform the service and Medi-Cal would not pay for the services if performed by an unlicensed medical assistant.

The jury found Drake guilty on all counts. The court granted him probation for five years, subject to certain conditions including serving one hundred eighty days in jail and payment of restitution, fines and fees.

DISCUSSION

I

*"Immediate Personal Supervision" Sufficiently Apprised Drake of His Supervision Responsibilities for Purposes of Section 14107\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 592.

## II

### *The "Bailey Doctrine" Does Not Apply Here*

■ Drake also contends the *"Bailey* doctrine" applies to the facts of this case and precludes his conviction (1) on four of the five Medi-Cal fraud counts, and (2) on both grand theft and Medi-Cal fraud counts. We disagree.

*People* v. *Bailey, supra,* 55 Cal.2d at page 519, held: "Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to *one intention, one general impulse, and one plan."* (Italics added.) The *Bailey* case dealt with the specific question of whether a series of misdemeanor petty thefts could be aggregated for the purpose of charging and convicting a defendant of one count of felony grand theft. (*Id.* at p. 518.) The court affirmed the defendant's conviction of grand theft for a series of petty thefts, concluding the jury was properly instructed that the several petty thefts could be so aggregated if done pursuant to an initial design to obtain a dollar amount exceeding the felony grand theft minimum (at that time $200). (*Id.* at pp. 518-520.)

Drake concedes there is no case which applies the *Bailey* doctrine to multiple instances of Medi-Cal fraud under section 14107, but he suggests it nevertheless should apply. We disagree and conclude the *Bailey* doctrine does not apply to multiple instances of Medi-Cal fraud. The multiple instances of Medi-Cal fraud in this case are more similar to the multiple instances of forgery discussed in *People* v. *Neder* (1971) 16 Cal.App.3d 846 [94 Cal.Rptr. 364]. In the *Neder* case the court held the *Bailey* doctrine did not apply to aggregate three offenses of forgery into a single offense. (*Id.* at pp. 851-855.) The court first observed the general rule that "separate acts, whether violating one or more than one statute, are separate offenses, and it makes no difference that the identical statute is violated with the same victim. . . ." (*Id.* at p. 851, citations omitted.) Distinguishing the offense of forgery from the offense of theft, the court reasoned: "In the instant case it is probably true that the forgeries were motivated by a preconceived plan to obtain merchandise from Sears by use of Miss Gruskin's credit card and by forging sales slips. However, we do not feel that the *Bailey* doctrine should be extended to forgery. That doctrine was developed for the crime of theft to allow, where there is a common plan, the accumulation of receipts from takings, each less than $200, so that the taker may be prosecuted for grand theft as opposed to several petty thefts. The essential act in all types of theft

is taking. If a certain amount of money or property has been taken pursuant to one plan, it is most reasonable to consider the whole plan rather than to differentiate each component part. [Citation.] The real essence of the crime of forgery, however, is not concerned with the end, i.e., what is obtained or taken by the forgery; it has to do with the means, i.e., the act of signing the name of another with intent to defraud and without authority, or of falsely making a document, or of uttering the document with intent to defraud. Theft pursuant to a plan can be viewed as a large total taking accomplished by smaller takings. It is difficult to apply an analogous concept to forgery. The designation of a series of forgeries as one forgery would be a confusing fiction." (*Id.* at pp. 852-853, fns. omitted.) Accordingly, the court declined to extend the *Bailey* doctrine to forgery offenses and affirmed the judgment convicting the defendant of three separate counts of forgery.

We likewise decline to extend the *Bailey* doctrine beyond theft offenses. The instant case is analogous to *Neder* where the essence of the offense is the means, rather than the ends, of the crime. In *Neder* the criminal statute was intended to punish "the act of signing the name of another with intent to defraud . . ." and was unconcerned with the amount of money or property taken thereby. (16 Cal.App.3d at pp. 852-853.) In *Bailey* the criminal statutes were intended to punish both the act and the ends (i.e., the amount of money or property taken by theft). In our case, section 14107 contains no provision regarding the amount of money or property taken, stating in pertinent part: "Any person who, with intent to defraud, presents for allowance or payment any false or fraudulent claim for furnishing services or merchandise . . . is punishable by imprisonment in the county jail not longer than one year or in the state prison, or by fine not exceeding five thousand dollars ($5,000), or by both such fine and imprisonment." Thus, section 14107 is concerned with the "means" as opposed to the "ends" of the offense. It is the act of a physician intentionally submitting a false or fraudulent claim that constitutes the offense rather than the amount of money the physician obtains through his or her fraudulent act. Accordingly, we conclude the *Bailey* doctrine does not apply to aggregate the five Medi-Cal fraud offenses in this case into just one Medi-Cal fraud offense.

We similarly conclude the *Bailey* doctrine does not apply to aggregate the grand theft offense with the Medi-Cal fraud offense. The essence of the grand theft offense under Penal Code section 487, subdivision 1 was the taking by false pretenses of an amount exceeding $400, whereas the essence of the Medi-Cal fraud offense was, as described above, the intentional submission of a false or fraudulent claim.

## DISPOSITION

The judgment is affirmed.

Benke, Acting P. J., and Nares, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 10, 1996.