Filed 10/7/13; mod. & partial pub. order 11/5/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ADAM DANIEL ANAYA et al.,<br><br>Defendants and Appellants. | F063835 & F064116<br><br>(Super. Ct. Nos. VCF232942C &<br>VCF232942A)<br><br>**OPINION** |

-ooOoo-

APPEALS from a judgment of the Superior Court of Tulare County.  Brett R. Alldredge, Judge.

Sylvia Whatley Beckham, under appointment by the Court of Appeal, for Defendant and Appellant Adam Daniel Anaya.

Robert L. S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant Eric Thomas Wolfe.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, and Leanne LeMon, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendants Adam Daniel Anaya and Eric Thomas Wolfe were tried together in the Superior Court of Tulare County on various criminal charges stemming from their forceful attempts to collect a criminal street gang debt. After their convictions, defendants were sentenced separately and appealed separately. Following consolidation of their appeals, defendants contend: (1) The convictions must be reversed because (a) the jury was provided conflicting instructions on the manner to assess the key witness's credibility, and (b) juror misconduct; (2) There is insufficient evidence to support (a) the extortion convictions, (b) the dissuading a witness convictions, and (c) the one battery conviction; (3) The life terms imposed for the extortion and the dissuading a witness convictions are not authorized; (4) As defendants have been improperly convicted of both robbery and receiving stolen property, the convictions for receiving stolen property must be reversed; (5) This case must be remanded for the trial court to impose or strike the gang enhancements to the term for the burglary convictions and the receiving stolen property convictions; and (6) Multiple enhancements for one prior serious felony conviction are not authorized, and only one stayed prior prison term should appear on the abstracts of judgment. As outlined below, we agree with defendants' contentions (3), (4), (5), and (6). Accordingly, the judgments are reversed in part and affirmed in part.

## PROCEDURAL BACKGROUND

In a first amended information, both defendants were alleged to have committed the crimes of extortion (Pen. Code,[1] § 520; count 1), burglary (§ 459; count 2), home invasion robbery (§ 211; count 3), assault by means likely to produce great bodily injury (§ 245, subd. (a)(1); count 4), dissuading a witness or victim (§ 136.1, subd. (b)(2); count 5), participation in a criminal street gang (§ 186.22, subd. (a); count 6), and receiving stolen property (§ 496, subd. (a); count 7). An additional count of dissuading a witness or victim (§ 136.1, subd. (b)(2); count 8) was alleged as to defendant Wolfe. Excepting

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

count 6, it was further alleged that the crimes were committed for the benefit of a street gang (§ 186.22. subds. (b)(1)(A), (C), (b)(4)). As to all counts, it was also alleged that each defendant had a prior strike conviction and a prior serious felony conviction (§§ 667, subds. (a)(1), (b)-(i), 1170.12, subds. (a)-(d)). Except for count 8, it was also alleged that defendant Anaya had suffered a prior prison term under section 667.5, subdivision (b). And it was further alleged with regard to the home invasion robbery that the crime was committed in concert with others (§ 213, subd. (a)(1)(A)).

During trial, the dissuading a witness or victim offenses (counts 5 & 8) were amended to allege violations of subdivision (b)(1) of section 136.1, and the assault likely to produce great bodily injury offense (count 4) was reduced to a battery (§ 242).

Following an eight-day trial, defendants were convicted on all counts. In bifurcated proceedings, defendant Anaya admitted the prior conviction allegations and the trial court found the prior strike and serious felony allegations against defendant Wolfe to be true.

On October 21, 2011, defendant Anaya was sentenced to a total of 30 years to life on count 3, plus five years for the prior serious felony conviction. Additional terms were imposed on the remaining counts, to be served either concurrently or stayed pursuant to section 654.

On November 7, 2011,[2] defendant Anaya filed a timely notice of appeal.

On December 13, 2011, defendant Wolfe was also sentenced to a total of 30 years to life on count 3, plus five years for the prior serious felony conviction. The sentences imposed on the remaining counts and special allegations were imposed concurrently or were stayed.

On December 22, 2011, defendant Wolfe filed a timely notice of appeal.[3]

---

[2]A second notice of appeal was filed November 16, 2011, by defendant Anaya pro se.

[3]On February 14, 2013, this court granted Wolfe's motion to consolidate the appeals. Further, defendants were deemed to have joined in one another's arguments to the extent the arguments were beneficial to each of them.

**FACTS**

*Facts Specific to the January 2010 Incident*

Eric Dahlberg lived across the street from his friend Roy Gomez in Tulare.  On January 31, 2010, Dahlberg called 911 after he became concerned about a number of people he observed at Gomez's home.  He had never seen these six or so men at his neighbor's home before.  Gomez and the others were standing near the driveway and appeared to be talking.  But then Gomez started backing up and the others were getting closer, "kind of circling around him."  Dahlberg thought it was a "little suspicious."  Gomez had backed up to the garage door and put his hands up.  Shortly thereafter, Gomez's cousin came out from inside the house.

Although Dahlberg could not hear what was being said, he could see clearly.  He focused on one person who appeared older and "darker."  That individual stood out and seemed like he was telling the others what to do.  He made lots of hand gestures:  when he pointed to the curb, two individuals went to the curb; when he pointed to the house, everyone else went inside.[4]  That individual also used his cell phone a couple times.  The individual "was in Roy's face," while the others were behind him.  Dahlberg did not witness any physical altercation.

By the time the police arrived in response to his call, Dahlberg was at the back of his house.  Because he could not clearly see individual faces, he could not identify anyone other than Gomez and his cousin.  Later, Gomez came to Dahlberg's door.  He was "breathing hard" and was "acting shocked."

Another neighbor, Richard Hernandez, was outside working on his truck that same date.  He recalled seeing "a bunch of guys" pull up in a couple cars.  He figured they were friends of Gomez's.  It was not unusual until he noticed the group had Gomez backed up against the garage door.  There were six or seven men, most of whom were

---

[4]Two individuals stayed at the curb when the others went inside.  They looked up and down the street.

young. Two were older and one stood out because he was the only one talking and everyone else surrounded him. Hernandez could not decide if that man was African-American or a dark complexioned Hispanic. That man was loud, "running his mouth," yelling and screaming.

Hernandez became concerned because Gomez was standing against the garage and everyone was "surrounding him." They no longer looked like friends. Although he did not talk to Gomez's cousin much, he knew who he was and he recognized him when he came outside. The group's focus then shifted to Gomez's cousin and they all went inside. About 10 minutes later, the police arrived.

When Hernandez gave his statement to police, his memory was fresh; he told the truth. He told Detective Jesus Guzman that the darker man had told Gomez's cousin, "This doesn't concern you. Get out of here." He recalled seeing the darker man on his cell phone; he wore a red hat. Gomez's cousin told the darker man that he did not have much money, but that he could take what he had. Hernandez recalled telling the detective that he saw "a larger white guy try to strike" Gomez.

In January 2010, Norteno gang member A.T. was living with his aunt, uncle, and cousin Roy Gomez in Tulare. In response to a midmorning knock, A.T. answered the door to find a man he believed to be John Delgado[5] asking to speak with his cousin. He knew who Delgado was because Delgado had visited Gomez in the past. A.T. noted there were other people waiting outside near a white truck and a white car, but he did not recognize the others. Gomez stepped outside with Delgado.

A.T. resumed speaking on the telephone with his girlfriend. Eventually, he heard people talking loudly or shouting. He hung up the telephone, assuming there was an argument, and went outside.

Once outside, A.T. found his cousin with his back to the garage. About seven people were encircling him. Gomez's hands were out (palms out at shoulder height) in

---

[5] "John" Delgado was actually Steven Delgado.

5.

front of him. He seemed scared and confused. Those surrounding Gomez were later identified as Wolfe, Anaya, Steven Delgado, Robert Pompa and others. Wolfe was standing "kind of offset"; A.T. had never met Wolfe but knew who he was.

Realizing the argument was about a debt[6] he himself owed, A.T. asked what was going on. Wolfe told A.T. to mind his own business and continued to confront Gomez over the fact he "owed the homies money." Eventually, A.T. was able to tell Wolfe that it was not Gomez they were looking for, rather it was him. Wolfe made a phone call. He then apologized to Gomez and pointed to A.T., saying, "You are the one."

Anaya, who had been standing near the sidewalk, said "cops," and pointed down the street. In response to this news, everyone went inside the house. Once inside, A.T. was surrounded by Wolfe, Delgado, Pompa and another individual. Anaya and a second individual stayed at the window as lookouts. Pompa struck him in the face and he was verbally harassed. Wolfe told A.T. he owed money and began grabbing items in the house. A.T. tried to explain that the house belonged to his aunt and that the property in the home was not his. He offered to pay what he owed, and also offered the $200 he had in his possession. In the room A.T. shared with his cousin, Wolfe and Anaya were "taking things apart"; A.T. again explained most of the property belonged to his aunt. Wolfe or Delgado told him to shut up.

At about this same time, the police knocked on the door. The officers had everyone exit the back room with their hands up. Identification was checked and names were taken. A.T. gave the officers a false name because he had violated his parole.[7] Ultimately, no one was arrested and the police left. A.T. did not say anything to the police then because he had been told to shut up.

---

[6]A.T.'s debt was incurred as a result of borrowing money or drugs from the gang (then selling the drugs for profit). A.T. borrowed from the gang on two occasions, fell behind on payments, and had not repaid that debt plus "tithe" and interest.

[7]In 2006, A.T. was convicted of second degree burglary and receiving stolen property.

After the police left, Wolfe, who did most of the talking, told A.T. what was going to happen. Wolfe said A.T. owed $5,000, it needed to be paid, and they would be taking items with them. He was reminded that he knew "what happens" to people who do not "pay up." He would be given a phone number for "Pablo." He was to call Pablo in an hour to receive additional information about whom to pay. A.T. told Wolfe he would do his best to pay the debt. Thereafter, A.T.'s belongings were loaded into a white or cream-colored Blazer, including computers, printers, hard drives and keyboards. He did not give anyone permission to take the items.

After Wolfe, Anaya and the others left, A.T. called the telephone number he was given for Pablo. He recognized the voice on the other end as that of Wolfe. A.T. was told to call the number the following day about a meeting. The next day, he called Pablo's number again; Wolfe answered. Wolfe advised A.T. that he would be picked up in 30 minutes; however, a few moments later, Wolfe called back. A.T. was advised they were waiting for him outside.

A.T. went outside and got into the car as requested. Wolfe was driving, Pompa was the front seat passenger, and Delgado was in the back. They went to what A.T. assumed was Pompa's home. Pompa offered him a beer, but he declined. He was nervous and fearful. Wolfe advised him he had 29 days within which to pay back $5,000. Although A.T. had borrowed $3,000, the amount increased significantly because of "fines." A.T. asked that his belongings be returned, but Wolfe denied the request. A.T. also asked if he could have "assistance" in repaying the debt. After making a telephone call, Wolfe denied A.T.'s request for assistance.

Despite having no job[8] or other financial resources, A.T. understood that if he did not repay the debt, he would be "done," as stated by Wolfe. A.T. understood "done" as meaning he would "be whacked" or killed. A.T. was further advised that if he loved his kids, he would pay the money within the time frame provided. He was then taken home.

---

[8]When in good standing, A.T. sold drugs on behalf of the Norteno gang. He is no longer a Norteno gang member.

Three or four days later, A.T. was arrested for absconding from parole and was taken to jail. Although he did not want to tell police about what had happened, and knew he was risking his life by doing so, A.T. also feared what would happen when the debt repayment deadline expired. He gave a statement to Detective Guzman and received protective custody.[9]

While serving time in jail, A.T. was transported to the Bob Wiley Detention Center. On a bus returning from court, Wolfe was seated behind him. Wolfe told him "not to do it," and that he could fix everything, including A.T.'s status with the gang. Wolfe offered A.T. a car and some money not to say anything. A.T. did not believe him. On another occasion, as he and Detective Guzman passed Wolfe in a cell, Wolfe said, "Don't do it A[.]."[10] That meant A.T. should not talk to the police.

A.T. is still afraid because he still owes money. By testifying, he is considered to be "telling on" defendants and "the whole rest of the gang."

Tulare Police Officer Jeremy Faiman testified that on January 31, 2010, about 1:10 p.m., he responded in a marked K9 patrol unit to a possible home invasion in progress. As he approached the home, he observed two subjects standing out front, looking up and down the street. After calling for additional units, he contacted those subjects, who were identified as Manuel Rubio and Mario Duarte. As he directed Rubio and Duarte to sit down with their hands in sight, Roy Gomez exited the home, quickly shutting the door behind him. Gomez consented to a look around the house, indicating a couple "homies" were inside. He was nervous.

---

[9]Once he was released from custody, A.T. was provided with additional protection in the form of housing, utilities, and food assistance, and was provided a cell phone as well. He received that assistance between February and September 2010, but was ultimately asked to leave the program after breaking a rule.

[10]Jesus Flores, a correctional deputy with the Tulare County Sheriff's Department, testified that on February 5, 2010, he was working at the main jail. He and Detective Guzman were escorting A.T. toward an interview room. As the group passed cell number 7, Flores heard someone say, "A[.], don't do it, don't do it." Flores looked back and saw Wolfe.

Officer Faiman and an undercover officer approached the unlocked door. They entered and cleared the home. Several people exited a bedroom. Everyone was "really calm. It was almost a scary calm." Wolfe, Anaya, Pompa, Delgado, Jaime Rodriguez, and Adrian Vasquez were identified. Other than a legal folding pocketknife, no weapons were found on anyone located in the home. When asked for identification, A.T. provided a false name. Later, Officer Faiman learned A.T.'s true name and that he was wanted for a parole violation.

While the police were present, no one in the home said anything about a crime being committed. They said "everything was cool, they didn't need any police assistance." Officer Faiman did not notice any computer equipment, but he was not looking for it. His focus was on the people inside. The television was not on, there was no beer in view, nor was there any food being prepared or grilled at the home. Thereafter, the investigation concluded and the officers left the residence.

Roy Gomez testified that he was living with his parents and cousin in January 2010. He recalled the day the police came to the house. A couple friends had come over to watch football and "hang out." He could not recall everyone's name.[11] Wolfe was there; he and Wolfe would get together now and then to watch football. Gomez could not recall how often Wolfe had been to his home; he had never been to Wolfe's house. Anaya was also there, arriving with Wolfe. Gomez had been introduced to Anaya previously through a friend whose name he did not remember. There were five or six people total.

Everyone arrived at the same time because Gomez recalled hearing the doorbell. He believed he answered the door and went outside to speak with them first. Everyone greeted one another, "nothing really serious." Then, with the exception of a few people who had stayed outside to smoke, the group headed inside. They had only been sitting

---

[11]Later, Gomez testified that he knew who Delgado and Pompa were. He thought he knew who Mario Duarte, Manuel Rubio and Jaime Rodriguez were as well. He claimed hearing the names of the others present that day "refreshed [his] mind."

down and watching television for two to three minutes when the police arrived. Gomez could see through the front window when the police arrived, and he went outside to see what the problem was.

The police advised him they had been sent about "a burglary or something going on." Gomez did not want the police to go inside his home, but he did acknowledge he was on parole and thus subject to search. He told the police there was no reason for them to go inside. He sat outside on the curb while the house was searched. After the police left, the group stayed at the house "for a little bit, watched TV and stuff, you know, and then everybody took off."

His cousin A.T. had a lot of computers. A.T. tried to sell everything he had that day, and did sell a computer to Wolfe after the police left. A.T. carried the computer he sold to Wolfe out to Wolfe's white Blazer.

Gomez stated there had not been any dispute or argument that day, nor did any physical violence occur. He did not know if he talked to Detective Guzman after his cousin's arrest. At the police station, Gomez "pled the right to remain silent," so he did not give a statement.[12] He denied telling the detective there had been a little misunderstanding and it had been straightened out and was not gang related. He did not tell Guzman he was struck or hit, nor did he tell Guzman that he did not know Wolfe. Neither did he recall telling Guzman anything about computers.

Although he used to be a gang member, Gomez was no longer a gang member because he "grew out of it." And he just "hung out" with the West Side Tulare Nortenos. Gomez has three felony convictions, the last in 2005.

Jaime Rodriguez testified for the defense. In January 2010, he recalled walking on the street in Tulare on his way to see his friend Isabel. He saw two friends standing outside a house he later learned belonged to Gomez. He stopped to say hello to Manuel

---

[12]Detective Guzman interviewed Gomez on February 4, 2010, at the Tulare Police Department. The videotaped interview was played for the jury.

10.

Rubio and Mario Duarte. They spoke for a few minutes and then Gomez invited them inside to watch the polo game and to barbeque. There were no arguments, fights, or disagreements. They watched the polo game for a few minutes before the police arrived. They had gone into a back room to smoke the marijuana Rodriguez had with him. They also looked at some computers; A.T. offered to sell the computers. The police arrived, but after checking everyone's identification, they left. Rodriguez then left because he was nervous. He was on probation and did not want to go back into custody.[13]

On February 4, 2010, Tulare police officers conducted a probation compliance check at a residence in Tulare. The officers were going to attempt to take Wolfe into custody. No one responded to the front door. Helicopter surveillance, however, noted someone leaving through the back. After a vehicle pulled out of the garage, a traffic enforcement stop was conducted on a white Chevy Blazer. Wolfe's girlfriend Desiree Villareal was contacted. She reported that Wolfe was at work. A subsequent probation search was conducted and numerous computer parts and equipment were located in the garage.

Detective Guzman with the Tulare County Police Department was assigned to investigate an incident involving A.T. Related thereto, on February 4, 2010, Wolfe and Anaya were taken into custody. Following *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436) warnings, Anaya gave a recorded statement. He indicated he was helping his girlfriend's uncle—Robert Pompa—pick up and load some computer equipment. He recalled carrying out a monitor and keyboard from inside a home. Anaya admitted knowing Delgado. He denied being a gang member himself, but acknowledged associating with Northerners, or Nortenos.

---

[13]On cross-examination, Rodriguez qualified the group was only discussing a barbeque. Detective Guzman testified he took Rodriguez's statement, and Rodriguez had told him there was a barbeque going on in the backyard. Rodriguez made no mention of marijuana.

On February 5, 2010, Detective Guzman responded to the main jail. He and Deputy Flores were walking with A.T. Passing Wolfe's cell, he heard Wolfe say, "[D]on't do it A[.], don't do it."

During the investigation Detective Guzman listened to more than 10 calls made from the Tulare County Sheriff's Department pretrial facility. He recognized the persons speaking in those phone calls as Wolfe, his girlfriend Desiree Villareal, and Wolfe's stepbrother Dexter Rabadan. Several of the recorded phone calls were played for the jury.[14]

*Facts Relevant to the Gang Allegations*

Patrick O'Donohoe is a peace officer with the City of Tulare. While on duty on November 20, 2006, O'Donohoe came into contact with Anaya. At the time, Anaya was wearing blue jeans, a gray sweatshirt, and white shoes with red shoe laces, a red belt, and a red and black '49ers beanie.

Tony Espinoza is a detective with the Tulare Police Department assigned to the gang unit. On July 16, 2009, the detective came into contact with Mario Duarte and Manuel Rubio. Duarte and Rubio, accompanied by Johnny Hernandez, were sitting on a park bench in Tulare. Duarte was photographed wearing various items of red clothing. There was writing or gang graffiti on the table in red ink, and each of the individuals had a red permanent ink marker in his possession.

On January 29, 2010, Detective Espinoza was on duty and conducted a traffic stop of a vehicle; the front license plate was not fully secured. Wolfe was the driver and Steven Delgado was the passenger. In a photo taken during the traffic stop, Wolfe was photographed wearing various items of red clothing. A few days later, on February 4,

---

[14]An investigator aide with the Tulare Police Department downloaded recordings of inmate phone calls made from the Tulare County jail to a particular telephone number provided by Detective Guzman. Phone calls were made on January 16, February 14, February 18 and February 25, 2010. The same telephone number was associated with all four calls.

12.

2010, Detective Espinoza assisted with the search of a residence. The car he had pulled over a few days earlier containing Wolfe was located at the home.

Detective Guzman was designated a gang expert. He estimated there were over 400 active gang members in Tulare. He described the formation of the Norteno gang and the signs and symbols related to the gang. The gang's activities included assaults, assaults with a deadly weapon, robberies, drug sales, and weapons possession. Guzman also testified to predicate offenses, gang packets, and the gang modules at the Bob Wiley Detention Facility.

In Detective Guzman's opinion, Wolfe is an active Northerner gang member and was on January 31, 2010. His opinion is based upon police reports, arrests, contacts, jail housing assignments, and information known to the department.

It is also the detective's opinion that Anaya is an active Northerner gang member and was on January 31, 2010. Guzman's opinion is based on the fact he asked Anaya if he was a gang member and Anaya responded, "'I guess so.'" His opinion is also based on Anaya's jail housing assignment and the fact that San Francisco '49ers clothing is typically worn as a symbol of the Northern gang.

Detective Guzman was also of the opinion that Delgado, Pompa, Duarte, Rubio and Rodriguez were all active gang members. Further, the detective believed A.T. was a gang member until January 31, 2010. He was no longer a gang member because he failed to pay his debt and because A.T. was considered a "rat" for telling the police about a crime committed by a fellow gang member.

Presented with a hypothetical situation involving similar facts, Detective Guzman believed the type of crimes alleged to have been committed would have been committed at the direction of and for the benefit of the Norteno criminal street gang. Additionally, those crimes would have been committed in association with the Norteno criminal street gang and furthered its objectives.

Defense expert Albert Ochoa, a behavioral interventionist, worked at a charter school in Visalia. He met with students, including those involved in gangs, every day.

13.

His past experience as executive director of a community center and mental health specialist at a youth services agency also put him in contact with young people involved in gangs, either as members or as associates. Ochoa has a certificate in basic counseling and psychology from La Puente Bible College. He is regularly contacted regarding his opinion on gang issues and has been previously certified as a gang expert in Tulare County.

Following his interviews with Wolfe and Anaya, and his review of the materials provided by Wolfe's attorney, Ochoa concluded that Wolfe and Anaya associate with the gang. In his opinion, they are not active gang members.

On cross-examination, Ochoa indicated that a photograph of Anaya wearing items of red clothing, taken during a 2006 contact with law enforcement, would not change his opinion that Anaya was not a gang member because the photo was six years old. Ochoa indicated he had not listened to the phone call between Wolfe and his half brother so that fact was not considered for purposes of his opinion. Ochoa acknowledged that he is paid to testify. He further acknowledged that were he to have found Wolfe and Anaya to be active gang members, he would not have been paid. Ochoa could not opine as to whether Delgado, Pompa and the others were gang members because he did not interview them. Ochoa agreed that an associate of the gang does not "call shots." He further agreed that if someone "pleads to a crime" and admits a related gang enhancement, he would opine that individual is an active gang member.

## DISCUSSION

### I.     Instructions Regarding Witness Credibility

Defendants contend the trial court erred when it instructed the jury with a portion of CALCRIM No. 226 that was inapplicable and, as a result, their rights to due process and the right to a jury assessment of the credibility of witnesses have been violated. Further, they assert the error was not harmless.

14.

## A. Applicable Standards

"'It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction. [Citations.] "[T]he fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial." [Citation.] "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." [Citation.]' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 328.)

"It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions. [Citation.]" (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.)

"In reviewing the purportedly erroneous instructions, 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' [Citations.] In conducting this inquiry, we are mindful that '"a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."' [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 957, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

We consider the instructions as a whole, along with the jury's findings and the closing arguments of counsel. (*People v. Cain* (1995) 10 Cal.4th 1, 36; *People v. Eid* (2010) 187 Cal.App.4th 859, 883.) We will find error only if it is reasonably likely the instructions as a whole caused the jury to misunderstand the applicable law. (*Estelle v. McGuire* (1991) 502 U.S. 62, 74; *People v. Kelly* (1992) 1 Cal.4th 495, 525-527.)

## B. The Language of CALCRIM No. 226

The jury was instructed with CALCRIM No. 226 as follows:

"You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate use your common sense and experience. You must judge the testimony of each witness by the same standards setting aside any bias or prejudice you may have. You may believe all, part or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe.

"In evaluating a witness's testimony you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are: How well could the witness, see, hear, or otherwise perceive the things about which the witness testified.

"How well was the witness able to remember and describe what happened?

"What was the witness's behavior while testifying?

"Did the witness understand the questions and answer them directly?

"Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with some one involved in the case or a personal interest in how the case is decided?

"What was the witness's attitude about the case or about testifying?

"Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?

"How reasonable is the testimony when you consider all the other evidence in the case? Did other evidence prove or disprove any fact upon which the witness testified?

"Did the witness admit to being untruthful? Has the witness been convicted of a felony?

"Was the witness promised immunity or leniency in exchange for his testimony?

"Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember.

"Also, 2 people may witness the same event yet see or hear it differently. If the evidence establishes that a witness's character for truthfulness has not been discussed among the people who know him or her you may conclude from a lack of discussion that the witness's character for truthfulness is good.

"If you do not believe a witness's testimony that he or she no longer remembers something that testimony is inconsistent with the witness's earlier statement on that subject. If you decide that a witness deliberately lied about something significant in this case you should consider not

16.

believing anything that witness says. Or, if you think the witness lied about some things but told the truth about others, you may simply accept the part that you think is true and ignore the rest."

## C.     Analysis

CALCRIM No. 226 instructs the jury on factors that it may consider in judging the credibility of a witness. We agree the trial court read to the jury an inapplicable portion of the instruction concerning character evidence: "If the evidence establishes that a witness's character for truthfulness has not been discussed among the people who know him or her you may conclude from a lack of discussion that the witness's character for truthfulness is good." This portion of the instruction was simply not relevant or applicable in light of the testimony at trial. "It is error for a court to give an 'abstract' instruction, i.e., 'one which is correct in law but irrelevant[.]' [Citation.]" (*People v. Rowland* (1992) 4 Cal.4th 238, 282.) Indeed, the Bench Notes to CALCRIM No. 226 instruct that the challenged language should be given only "if relevant based on the evidence." The challenged portion of the instruction, addressing circumstances in which the jury could assume good character for truthfulness from the absence of a discussion among character witnesses about the witness's character for honesty, was irrelevant because no evidence supported it. Thus, the court erred in giving it.

However, this error did not prejudice defendants. We look to other instructions given to the jury in assessing prejudice. (*People v. Sanders* (1995) 11 Cal.4th 475, 536-537.) Here, the jurors were thoroughly instructed on how to evaluate the testimony of witnesses, which in addition to CALCRIM No. 226 included the following: CALCRIM Nos. 301 (Single Witness's Testimony), 302 (Evaluating Conflicting Evidence), 316 (Additional Instructions on Witness Credibility—Other Conduct), 318 (Prior Statements as Evidence), 332 (Expert Witness Testimony) and 333 (Opinion Testimony of Lay Witness). Significantly, too, the jury was instructed with CALCRIM No. 200, which provided in pertinent part: "Some of these instructions may not apply, depending on your findings about the facts of the case. After you have decided what the facts are, follow the

17.

instructions that do apply to the facts as you find them." Thus, it is most likely the jury ignored the challenged portion of the instruction after correctly determining it was not relevant or applicable. (*People v. Gonzales*, *supra*, 51 Cal.4th at p. 940.) Additionally, as the Attorney General argues, the challenged language applied to all witnesses, not just the victim. Given the number of credibility factors and instructions, nothing suggests the verdicts obtained here were the result of any consideration of the challenged language. Notably too, neither party mentioned nor emphasized the challenged language in closing arguments to the jury, further reducing the likelihood of prejudice.

We find it is not reasonably likely the instructions as a whole caused the jury to misunderstand the applicable law. (*Estelle v. McGuire*, *supra*, 502 U.S. at p. 74; *People v. Kelly*, *supra*, 1 Cal.4th at pp. 525-527.) In sum, the error was harmless under either the state or federal constitutional standard of error. (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## II.     The Sufficiency of the Evidence

Defendants contend there was insufficient evidence to support their convictions for extortion, witness intimidation, and battery with a gang enhancement.

### A.     Applicable Legal Authorities

In assessing a claim of insufficiency of the evidence, the reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value upon which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. It is the jury that must be convinced of a defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*People v. Watkins* (2012) 55 Cal.4th 999, 1019-1020; *People v. Rodriguez*

(1999) 20 Cal.4th 1, 11; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

In reviewing a challenge to the sufficiency of the evidence, appellate courts do not determine the facts. We examine the record as a whole in the light most favorable to the judgment and presume the existence of every fact the trier of fact could reasonably deduce from the evidence in support of the judgment. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) If the verdict is supported by substantial evidence, a reviewing court must accord due deference to the trier of fact and not substitute its evaluation of a witness's credibility for that of the fact finder. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) The testimony of a single witness—unless physically impossible or inherently improbable—is sufficient for a conviction. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.)

An appellate court must accept logical inferences that the jury might have drawn from circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396.) Before the judgment of the trial court can be set aside for insufficiency of the evidence, "it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the jury." (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429; see *People v. Conners* (2008) 168 Cal.App.4th 443, 453.)

## B.    Extortion

Defendants contend there is insufficient evidence to support their convictions pertaining to extortion because there is no evidence the victim "was placed in the position of having the choice of paying money or being killed before [he] handed over the cash he had on his person" and because the victim "testified he had no choice." Additionally, defendants assert that because the "takings were both accomplished with the use of the same force, from the [victim]'s immediate presence, and the evidence demonstrated that the takings were both committed with intent to permanently deprive [the victim] of his money and property … there was but a single episode of robbery under the *Bailey* doctrine," requiring reversal of the convictions for extortion.

19.

"Extortion is the obtaining of property from another, with his consent, … induced by a wrongful use of force or fear …." (§ 518.) Relevant here, section 519 further provides that "Fear, such as will constitute extortion, may be induced by a threat, either: [¶] … To do an unlawful injury to the person or property of the individual threatened or of a third person …." Section 520 provides as follows:

> "Every person who extorts any money or other property from another, under circumstances not amounting to robbery or carjacking, by means of force, or any threat, such as is mentioned in Section 519, shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 for two, three or four years."

### 1. *Relevant Testimony and Argument*

The following colloquy concerned the testimony about money and property taken from A.T.:

> "[PROSECUTOR:] Q. Okay. Now let's back up because that was a lot of information. So you get punched, some of the guys in there are saying get back in the circle and [defendant] Wolfe says round everything up, this guy owes money and he is pointing at you pretty much?
>
> "[A.T.:] A. Yeah.
>
> "Q. Well obviously. How, was that right after the punch pretty much?
>
> "A. Yeah, yeah.
>
> "Q. Okay. And do people start going and taking property at that point?
>
> "A. Yes.
>
> "Q. Do they start going through the house?
>
> "A. Yes.
>
> "Q. Okay. And did you have any property at the house?
>
> "A. Some, yes.
>
> "Q. Okay. And but most would it be fair to say that most of the items in there were your aunt's and your uncle's?

"A. Yes, her house, it is her house, of course.

"Q. Now did you have any money on you as well?

"A. Yes.

"Q. And if you recall approximately how much money?

"A. I believe it was 200? 200 something.

"Q. 200 some dollars?

"A. Yes.

"Q. Did you try to give that money to them?

"A. Yes.

"Q. Now was that taken from you or did you hand it over?

"A. It was taken. It was handed over.

"Q. All right. You handed it over?

"A. Yes.

"Q. Did you feel at that moment that you had any choice?

"A. No. No.

"Q. Okay. And the property, now you didn't obviously, did you hand it to them or did they just go back in the room and take it?

"A. They went back in the room and as I followed them they were like on me like whoa, what are you trying to grab? I am not trying to grab nothing. What are you trying to get? And I was, I don't have no weapon, dudes. I am not trying to get nothing."

During closing argument, the People argued as follows with regard to the extortion counts:

"[PROSECUTOR:] Now Count 1, extortion, now you could say that the computer fall[s] in this category as well and convict for the computer as well. However I think Count 1, extortion, the money is more appropriate because [A.T.] testified that he handed over the money. The defendant threatened to unlawfully injure or use force against another person or a third person. Well we have the Roy Gomez, we have the force against

21.

[A.T.], we have the encircling of Roy Gomez, there is all sorts of displays of force or fear going on out there. When making the threat the defendant intended to use that fear or force to obtain the other person's consent to give the money or property. In that case he consented to hand over the property. When the other person consented to give the defendant money or property and as a result of the threat or use of force the other person then gave the defendant money or property. And that would be handing the money to [defendant] Wolfe.

"Now [defendant] Wolfe was very active in carrying out this and demanding money and telling him that he is going to pay up. [Defendant] Anaya was there standing look out while all this is going on and you remember [A.T.'s] testimony that well initially when they are outside [defendant] Anaya stood on the curb and announced, 'cops' and that is when they went inside. And when they are inside and when he got punched standing in the living room he then, [defendant] Anaya was standing at the window looking out. [¶] … [¶]

"Now consent for extortion can be coerced or unwilling as long as it is given as a result of the wrongful use of force and is cut off the fear [*sic*]. Both the defendants, [defendant] Anaya, [defendant] Wolfe are guilty of extortion. They came there to get money, they used force or fear and … [A.T.] because of that force or fear consented to hand over his money."

### 2.      *Choice or Lack of Consent*

Because the victim testified he had no choice, defendants contend there is insufficient proof of extortion.[15]  For purposes of establishing extortion, the victim's consent is "coerced and unwilling." (*People v. Goodman* (1958) 159 Cal.App.2d 54, 61.) "The victim of an extortioner might openly consent to the taking of his money 'and yet protest in his own heart' against its being taken." (*People v. Goldstein* (1948) 84 Cal.App.2d 581, 586.)  Therefore, the victim of extortion does not, in actuality, "consent" to the taking of his property. That element is more precisely a "coerced consent," which amounts to no consent at all. (See *People v. Davis* (1998) 19 Cal.4th 301, 305, fn. 3.)  It is the use of force or threat to *induce* consent that sets extortion apart from theft. (*People v. Goldstein*, *supra*, at pp. 585-586.)  Here, defendants and others, by their behavior and

---

[15]In popular parlance, extortion is "sometimes called 'blackmail.'" (*People v. Sales* (2004) 116 Cal.App.4th 741, 748.)

22.

words, coerced the victim into handing over the money then in his possession. The victim had already observed the group harassing his cousin outside, he himself had been struck in the face and verbally harassed once the group had moved inside the house, his aunt's possessions were being rifled through, and he was repeatedly advised that he owed a debt that must be repaid in the near future in order to avoid further harm. The victim offered his own money while his relatives' property was also being identified for collection toward repayment of his debt. His offering or handing over the cash amounted to coerced consent. The force and fear employed by defendants and others induced the victim to hand over the cash. There is sufficient evidence of extortion. The individuals then went into the room the victim shared with his cousin. The victim's own property, computers, were taken without his consent. That conduct forms the basis of the robbery convictions. We find coerced consent to be the equivalent of a lack of choice. Therefore, when A.T. testified he felt as though he had no choice, that testimony spoke to the element of coerced consent.

To the degree defendants can be understood to argue that because the elements of extortion when applied factually may also meet the elements of robbery, and thus only the crime of robbery has been committed, they are incorrect.

Robbery is the "taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Extortion, however, is the obtaining of property from another with his or her consent induced by force or fear. (§ 518.) The offenses are "structurally similar" and are rooted in the common law of larceny. (*People v. Kozlowski* (2002) 96 Cal.App.4th 853, 866; *People v. Hesslink* (1985) 167 Cal.App.3d 781, 790.) Robbery and extortion share a comment element: the taking of property with force or fear. Nevertheless, they are distinguishable. Robbery requires a taking against the victim's will. Extortion requires a taking with the victim's consent. (*People v. Torres* (1995) 33 Cal.App.4th 37, 50.)

23.

In *Torres*, the defendant was a "rent" collector for a Los Angeles street gang. While performing his collection duties, the defendant shot and killed a drug dealer. The defendant also attempted to obtain money at gunpoint from a passerby who was not a drug dealer. (*People v. Torres*, *supra*, 33 Cal.App.4th at p. 42.) At trial, a police officer with the gang unit testified without objection that the defendant attempted to rob both of his victims; he also testified as to his interpretation of the crimes of robbery and extortion. The jury found the defendant guilty of first degree murder in perpetration of an attempted robbery, in addition to two counts of attempted robbery. On appeal, the defendant alleged error regarding the officer's opinions on the crimes committed and the defendant's guilt associated with those crimes. (*Id*. at pp. 42-44.) The court agreed with the defendant that a witness may not express an opinion regarding the definition of a crime, and may not express an opinion regarding the defendant's guilt or innocence. (*Id*. at pp. 45-48.) In addressing the ineffectiveness of the defendant's trial counsel for his failure to object to the expert's testimony, the court noted the following:

> "One distinction between robbery and extortion frequently noted by courts and commentators is that in robbery property is taken from another by force or fear 'against his will' while in extortion property is taken from another by force or fear 'with his consent.' The two crimes, however, have other distinctions. Robbery requires a 'felonious taking' which means a specific intent to permanently deprive the victim of the property. [Citation.] Robbery also requires the property be taken from the victim's 'person or immediate presence.' [Citation.] Extortion does not require proof of either of these elements. [Citations.] Extortion does, however, require the specific intent of inducing the victim to consent to part with his or her property." (*Id*. at p. 50, fn. omitted.)

Even if the facts meet the elements of the crime of robbery, because extortion requires the specific intent to induce the victim to consent to part with his property, defendants' crime in taking A.T.'s cash amounts to extortion, not robbery.

In sum, after reviewing the entire record in the light most favorable to the judgment, there is substantial evidence to support the extortion convictions.

### 3. *The Bailey Rule*

More than 50 years ago, the California Supreme Court decided *People v. Bailey* (1961) 55 Cal.2d 514. There, the defendant committed welfare fraud and received a number of payments, none of which alone sufficed to constitute grand theft. Collectively, however, the fraud would serve to constitute grand theft. The court determined the defendant was properly convicted of grand theft rather than a series of petty thefts. It authorized the aggregation of separate acts of theft into a single offense for the purpose of bringing a felony allegation when the thefts were committed pursuant to a single intent, impulse, and plan. (*Id.* at pp. 518–519.) This holding has become known as the *Bailey* rule. The *Bailey* rule has been extended to prevent a defendant from being convicted of more than one count of grand theft where the takings were committed against a single victim and the evidence discloses only one general intent. (*People v. Richardson* (1978) 83 Cal.App.3d 853, 866, disapproved on other grounds in *People v. Saddler* (1979) 24 Cal.3d 671, 682, fn. 8; *People v. Packard* (1982) 131 Cal.App.3d 622, 626*; People v. Kronemyer* (1987) 189 Cal.App.3d 314, 363-364.) For the next 47 years, the *Bailey* rule was limited to theft cases. (*People v. Neder* (1971) 16 Cal.App.3d 846, 852 [not extended to forgery]; *People v. Drake* (1996) 42 Cal.App.4th 592, 596 [not extended to fraud]; *People v. Washington* (1996) 50 Cal.App.4th 568, 575, 577–578 [not extended to burglary].)

Defendants contend that the "multiple convictions of robbery and extortion committed against [the victim are] an indivisible transaction with the single intent and objective of collecting a debt owed to the gang." Thus, because the *Bailey* doctrine precludes "multiple takings from the same victim [in] a single theft if the takings are pursuant to one continuing impulse, intent, plan, or scheme," defendants contend their convictions must be reversed.

The question of whether multiple takings are committed pursuant to one intention, general impulse, and plan is a question of fact for the jury based on the particular circumstances of each case. (*People v. Packard*, *supra*, 131 Cal.App.3d at p. 626.) On

appeal, we uphold the fact finder's conclusion if it is supported by substantial evidence. (*People v. Tabb* (2009) 170 Cal.App.4th 1142, 1149-1150.) Where the evidence supports only one reasonable conclusion, the question may be resolved as a matter of law. (*Packard*, *supra*, at pp. 626-627.)

Defendants rely upon a number of authorities in support of their assertion that because there was a single intent and objective in collecting a debt owed to the gang, their "multiple convictions of robbery and extortion" should be reversed. However, there are factual distinctions present in those cases that are not present here. In *Bailey*, the defendant engaged in multiple acts of petty theft (*People v. Bailey*, *supra*, 55 Cal.2d at p. 518); in *Richardson*, the defendant engaged in multiple acts of attempted grand theft (*People v. Richardson*, *supra*, 83 Cal.App.3d at p. 857); in *Packard*, the defendant engaged in multiple acts of grand theft (*People v. Packard*, *supra*, 131 Cal.App.3d at p. 625); and in *Kronemyer*, the defendant engaged in multiple acts of grand theft (*People v. Kronemyer*, *supra*, 189 Cal.App.3d at p. 324). Here, in contrast, instead of being convicted of multiple counts of the *same* offense, defendants were convicted of *different* offenses, albeit theft-related offenses.

We note that unlike the aforementioned authorities where it was plain the defendant had a single intent and objective, in light of the particular circumstances here, the contrary can be reasonably inferred. The intent and objective of the visit to the Gomez residence did involve collection of a gang debt. But the takings here are distinct, and that sets them apart. Because robbery and extortion are distinguishable regarding the manner of the takings involved—one with coerced consent and one in the absence of consent—it follows that the intent and objectives of those crimes can be different. An objective of the crime of extortion involves inducing consent; no such objective is present in a robbery. Said another way, the takings in the cases finding the *Bailey* rule applicable did not involve different objectives. Notably too, the evidence establishes that the crime of extortion arose during the course of the robbery. It can be inferred that because the offer to pay the cash was made by A.T. in the first instance, instead of in response to a

26.

request by defendants or anyone else present, that particular crime was not planned. Thus, while the objective was to collect a gang debt by way of a home invasion robbery, there is no evidence to suggest the gang planned and intended to collect upon its debt by way of extortion.

Thus, we find the *Bailey* rule does not apply to bar defendants' convictions for both robbery and extortion.

### C.     Witness Intimidation

In counts 5 and 8 of the amended information, defendants were charged with dissuading a witness pursuant to section 136.1, subdivision (b)(2). During trial, these counts were amended to allege violations of subdivision (b)(1) of that section. Defendant Anaya asserts that because the "jury must have found [he] was liable under the alternative theory of aiding and abetting," and because his involvement "was his mere presence at the time the alleged witness intimidation was committed," there is insufficient evidence to support his conviction on this count.

Section 136.1, subdivision (b)(1) provides:

> "Except as provided in subdivision (c), every person who attempts to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from doing any of the following is guilty of a public offense and shall be punished by imprisonment in a county jail for not more than one year or in the state prison:

> "… Making any report of that victimization to any peace officer or state or local law enforcement officer …."[16]

---

[16]The jury was instructed with CALCRIM No. 2622:

"The defendants are charged in Count FIVE with intimidating a witness in violation of … section 136.1. Defendant ERIC WOLFE is separately charged in Count EIGHT with intimidating a witness

"To prove that a defendant is guilty of this crime, the People must prove that:

"1. The defendant maliciously tried to discourage [A.T.] from making a report that he or she was a victim of a crime to any peace officer or state or local law enforcement officer.

"2. [A.T.] was a crime victim;

"AND

27.

When arguing the facts of this count to the jury, the prosecutor stated, in relevant part:

> "… So when [A.T.] is standing, is in the bedroom and the police show up on January 31st, 2010, and [defendant] Wolfe and Steve Delgado say to [A.T.], you know you are not going to say anything to the police.… [¶] … [¶]

> "Now [defendant] Anaya. [Defendant] Anaya didn't say anything but this witness intimidation is a part of the operation, this is what they are carrying out. They have come in there, there is a chance the police could come and [defendant] Anaya is back in the bedroom, he is present, he is one of a number of subjects and when this is said to [A.T.] he hears it. But he still goes about doing what he does. Why? Because he can, has this comfort that [A.T.] is not going to cooperate with the police and they get marched out there and he doesn't say anything to the police and [defendant] Anaya does not say a thing to the police. He adopts all the actions of [defendant] Wolfe, of Delgado. Those statements, that intimidation, that statement to not cooperate.

> "And then what does he do after the police leaves? In the comfort of knowing that he is secure with his other gang members and not going to be arrested he goes out back in that bedroom and gets computers and continues on with the mission, what they are there to accomplish."

A person aids and abets the commission of a crime when the person, acting (1) with knowledge of the perpetrator's unlawful purpose, and (2) with intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates the commission of the crime. (*People v.*

---

"3. The defendant knew he was trying to discourage [A.T.] from causing arrest or causing prosecution, and intended to do so.

"A person acts *maliciously* when he or she unlawfully intends to annoy, harm, or injure someone else in any way, or intends to interfere in any way with the orderly administration of justice.

"As used here, *witness* means someone or a person the defendant reasonably believed to be someone who knows about the existence or nonexistence of facts relating to a crime.

"A person is a *victim* if there is reason to believe that a federal or state crime is being or has been committed or attempted against him or her.

"It is not a defense that the defendant was not successful in preventing or discouraging the victim.

"It is not a defense that no one was actually physically injured or otherwise intimidated."

28.

*Prettyman* (1996) 14 Cal.4th 248, 259; *People v. Beeman* (1984) 35 Cal.3d 547, 561; see also CALCRIM No. 401.)

Direct evidence of the defendant's mental state is rarely available and may be shown with circumstantial evidence. (*People v. Beeman*, *supra*, 35 Cal.3d at pp. 558-559.) Although mere presence at a crime scene and failure to prevent the crime, even with knowledge of the perpetrator's criminal purpose, do not constitute aiding and abetting, the trier of fact may consider such circumstances in determining aiding and abetting liability. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 529–530.) An unexplained presence at the scene of a crime implies complicity. (*People v. Wilson* (1928) 93 Cal.App. 632, 636.) Other circumstances to be considered are companionship, and conduct before and after the offense, including flight, which can indicate guilt. (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094; *People v. London* (1988) 206 Cal.App.3d 896, 903.) Whether a person is an accomplice is a question of fact for the jury, unless there is no dispute as to the facts or the inferences to be drawn from them. (*People v. Avila* (2006) 38 Cal.4th 491, 565.)

Here, A.T. testified that after leaving the living room area of the Gomez residence where defendant Anaya had been acting as a lookout, the group proceeded to the bedroom A.T. shared with his cousin. Defendants Wolfe and Anaya were both present. A.T. was trying to explain that not all of the possessions in the home belonged to him when the police arrived. He was told by defendant Wolfe and perhaps Delgado to shut up and not say anything.

The offense of witness dissuasion may be based upon the cumulative outcome of any number of acts, including acts that alone might not be criminal, considered in their totality. The proper focus, therefore, must be on the cumulative effect of the group's earlier contact with Gomez outside the residence, defendant Anaya's actions as a lookout for the group, the warnings communicated by defendant Wolfe and others, the close relationships between the various people involved in these events, and the gang milieu.

In the context of all the words, conduct and circumstances, the evidence was more than sufficient to support defendants' convictions of violating section 136.1.

In *People v. Campbell* (1994) 25 Cal.App.4th 402, the codefendant Smith's convictions for aiding and abetting an attempted robbery and attempted murder were upheld based on his presence during the robbery and his postoffense conduct. During the robbery, codefendant Campbell produced a handgun and aimed it at the victim. On appeal, Smith claimed the evidence only showed he was present when Campbell attempted to rob the victim. This contention was decisively rejected. The court pointed out that Smith was not surprised by Campbell's conduct or afraid to interfere with it. It found that "[t]heir concerted action reasonably implies a common purpose" and that the jury could find Smith's act of standing in front of the victims was intended "to intimidate and block them, divert suspicion, and watch out for others who might approach. Such conduct is a textbook example of aiding and abetting." (*Id*. at p. 409.) That same reasoning applies here. While defendant Anaya did not verbalize any threat in an attempt to dissuade A.T. from reporting the crime, he was not surprised by defendant Wolfe's or Delgado's conduct, nor the conduct of any other person present, nor was he afraid to interfere. The group's concerted action reasonably implied a common purpose. Defendant Anaya acted as a lookout, both outside and inside the home. Like the *Campbell* court, we find defendant Anaya's conduct to be a classic example of aiding and abetting.

Neither does *People v. Leon* (2008) 161 Cal.App.4th 149 dictate a contrary result. In *Leon*, Martin and Angel returned home early one morning to find two men, Leon and Rodriguez, "'messing'" with their truck. (*Id.* at p. 153.) Martin yelled at the men to leave; he was calling the police. Rodriguez looked at Martin and Angel and fired a gun in the air. (*Id*. at p. 154.) Rodriguez and Leon were charged, among other crimes, with attempting to dissuade a witness from reporting a crime. The jury found them guilty of that crime. The People's sole theory of Leon's guilt on that count was he aided and abetted Rodriguez's commission of the crime. (*Id*. at p. 156 & fn. 2.)

30.

On appeal, Leon argued there was insufficient evidence to find him guilty of witness intimidation on an aiding and abetting theory of liability under the natural and probable consequences doctrine. The People noted Leon and Rodriguez were members of the same gang and they were burglarizing cars in a rival gang's territory. Also, Leon had ammunition and a firearm on him after he and Rodriguez fled the scene of the burglary. The People argued this evidence, in combination with Leon's action in "'*staring* at the person who said he was going to call the police and walking with Rodriguez while Rodriguez shot a gun in the air, encouraged and/or facilitated Rodriquez in his commission of this offense.'" (*People v. Leon*, *supra*, 161 Cal.App.4th at p. 159.) Noting there was no evidence that Leon stared at a witness, the court concluded none of the other evidence was sufficient to support a finding that Leon "'by act or advice, aid[ed], promote[d], encourage[d] or instigate[d] the commission' of witness intimidation." (*Ibid*.) The court also rejected the notion that Leon aided and abetted a crime the natural and probable consequence of which was witness intimidation. Finding no close connection between the target crimes and the witness intimidation, the court reversed the guilty verdict against Leon on the witness intimidation charge. (*Id*. at p. 160.)

Here, unlike *Leon*, there was evidence other than defendant Anaya's mere presence at the scene of the crime sufficient to establish his liability as an aider and abettor. Defendant Wolfe and Delgado may have issued the verbal warning not to tell anyone about what had happened, but there is evidence that defendant Anaya's actions encouraged that conduct: Anaya left his post as a lookout in the living room and followed the others into the bedroom where possessions inside the home were identified for removal. This evidence establishes he was an active participant in a larger plan. Further, to "trigger application of the 'natural and probable consequences' doctrine, there must be a close connection between the target crime aided and abetted and the offense actually committed." (*People v. Prettyman*, *supra*, 14 Cal.4th at p. 269.) Here, also unlike *Leon*, there is evidence of a close connection between the target crime aided and

31.

abetted and the offense actually committed. We find that home invasion robbery and extortion perpetrated in order to collect on a debt owed to the gang is closely connected to intimidating the victim of that same crime.

In his reply brief, defendant Anaya asserts that because the "police suddenly arrived unexpectedly," and the group "did not anticipate that the police would be called by neighbors," the witness intimidation here was an unanticipated event. He contends it is "much like the witness's [*sic*] in *Leon* happening to catch the car burglars in the act." We do not agree. The facts establish that defendant Anaya called out "cops" while serving as a lookout on the sidewalk in front of the Gomez residence. In fact, as a result of defendant Anaya's warning, the group moved its confrontation from the outside to the inside. Thus, it is entirely reasonable for a jury to infer the police contact was a very real possibility given these circumstances, versus an unanticipated event.

> "It has been consistently held that one who was present for the purpose of diverting suspicion, *or to serve as a lookout*, or to give warning of approach of anyone seeking to interfere, or to take charge of an automobile and to keep the engine running and to give direct aid to others in making their escape, is a principal in the crime committed. Any one of the above purposes mentioned would be sufficient upon which to base … aiding and abetting …." (*People v. Silva* (1956) 143 Cal.App.2d 162, 169, italics added.)

The evidence established defendant Anaya served as a lookout outside as well as inside the home. Defendant Anaya's claim that he did not act as a lookout while in the bedroom, and hence did nothing to aid, promote, or otherwise encourage witness intimidation, is unavailing. The record is replete with references to the group going "back" into the bedroom. Thus, it is reasonable to infer the bedroom A.T. shared with his cousin was in the back of the home. There would have been no need for defendant Anaya to serve as a lookout in a back bedroom. His aid at that moment was part of the larger concerted action by the group to enforce collection of a debt.

Viewing the evidence in the light most favorable to the verdict following a review of the entire record, we find the evidence is sufficient to support defendant Anaya's conviction in count 5.

### D. Battery with Gang Enhancement

Defendants contend there is insufficient evidence to establish that they aided and abetted Pompa when he struck A.T. at the Gomez residence. Additionally, they assert liability cannot attach under the natural and probable consequences doctrine because the jury was not instructed accordingly.

"A battery is any willful and unlawful use of force or violence upon the person of another." (§ 242.) In addition to being instructed regarding the crime of battery, the jury was also instructed as follows:

> "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."

Further, the jury was instructed that

> "[t]o prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:
>
> > "1. The perpetrator committed the crime;
> >
> > "2. The defendant knew that the perpetrator intended to commit the crime;
> >
> > "3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;
> >
> > "AND
> >
> > "4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.
>
> "Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

"If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

During closing argument, the People argued in pertinent part:

"Now I wanted to start off with this, aiding and abetting. The general principles of it, because what we have here is a unique situation, this isn't one individual acting alone.… [¶] … [¶] … Because all 7 of those guys when they pulled up to that residence knew exactly what was going to go down that day. They came there with an objective. They were on a mission. They went over there to collect $5,000 … or at least collect what they could on that day and take care of the rest later on or else. It started from the very outset outside before they ever entered the residence, the confrontation, physical force and display of intimidation from the outset.… [¶] … [¶] … And every one there knew what was going down.

"They organized a squad with an objective ready to carry out crimes for the benefit of the gang. They showed up there with [defendant] Wolfe as their leader ready to take care of business, ready to go collect. Ready to go discipline and ready to get the gang's money back so they can continue operating as a gang. [¶] … [¶]

"Count 4, battery. The defendant willfully touched [A.T.] in a harmful or offensive manner. This is the punch that Robert Pompa threw on [A.T.].…"

The prosecutor also argued the participants "were all playing different roles carrying out the final objective of getting that property. Some were look out, some were force, some were carrying out property. And [defendant] Wolfe was ordering it all."

"A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164; see *People v. Beeman*, *supra*, 35 Cal.3d at p. 561.)

"Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment." (*People v. Mitchell* (1986) 183 Cal.App.3d 325, 329.)

Here, there is sufficient evidence defendants aided and abetted Pompa when he battered A.T. It is reasonable to infer that when multiple persons surrounded A.T. in the living room of the Gomez residence (as they had done to Gomez outside earlier), while defendant Anaya and another individual were keeping lookout at the window, each knew what the other intended. As the prosecutor argued to the jury, each member of the group had a job to do. It was reasonable for the jury to infer that Pompa's job was enforcer. It heard testimony Pompa was a very large man: six feet one inch to six feet two inches tall and weighed about 260 to 270 pounds. It was reasonable for the jury to infer defendant Anaya was the lookout as defendant Anaya was positioned on the sidewalk outside and at the window inside. It was reasonable for the jury to infer defendant Wolfe was the leader as a number of witnesses testified he acted as though he were in charge. The jury also heard evidence that when a debt is owed to the Norteno gang, a "squad," composed of a "[s]quad leader [and] squad members" is sent to collect that debt; "[t]hey are the repo man." Here then, it was reasonable for the jury to infer that defendant Wolfe was the squad leader and that the others, including defendant Anaya and Pompa, carried out his directions as squad members. Notably too, neither defendant Anaya nor defendant Wolfe attempted to intervene or diffuse the situation. In fact, after being struck, A.T. backed up to avoid a second punch, but the group herded him back into the circle. They called him a "punk," cussed at him, and asked him how he could have let his "cousin go through that." This evidence is sufficient to establish that defendants had knowledge of Pompa's unlawful purpose, both defendants acted with the intent or purpose of committing, facilitating or encouraging a battery, and by those acts, promoted, encouraged or instigated the battery committed against A.T. by Pompa. (*People v. Cooper*, *supra*, 53 Cal.3d at p. 1164.)

We are not persuaded by defendants' assertions that the jury convicted them based upon their mere presence at the scene of the crime. Defendants are correct that

> "neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission. [Citations.] However, '[a]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' [Citation.]" (*People v. Campbell*, *supra*, 25 Cal.App.4th at p. 409.)

Here, there is evidence over and above defendants' mere presence at the scene of the battery. Defendants are companions as members of the Norteno gang. They sought to collect on a gang debt they originally believed was owed by Gomez. Instead, when A.T. interrupted their attempts at collection of the debt from his cousin to acknowledge he had incurred the debt, their attentions were immediately diverted to A.T. The jury was presented with evidence from which it could reasonably infer that both defendants acted with knowledge and intent to aid or encourage Pompa in the commission of a battery against A.T.

The foregoing are all reasonable inferences to be made based upon the evidence before the jury. Because the evidence was sufficient to sustain the convictions, we need not address defendants' additional assertion that they are not liable as an aider and abettor on the theory that the battery was a natural and probable consequence. Reversal is not required. (*People v. Mitchell*, *supra*, 183 Cal.App.3d at p. 329.)

## III.    Sentencing Issues

Defendants contend the court committed *Apprendi* (*Apprendi v. New Jersey* (2000) 530 U.S. 466) error when it sentenced them to life terms on counts 1 and 5 pursuant to section 186.22, subdivision (b)(4)(C).

### A.    Relevant Authorities

The Sixth and Fourteenth Amendments to the United States Constitution preclude a trial court from imposing a sentence above the statutory maximum based on a fact, other than a prior conviction, not found to be true by a jury. (*Cunningham v. California*

36.

(2007) 549 U.S. 270, 274-275; *Blakely v. Washington* (2004) 542 U.S. 296, 303-304; *Apprendi*, *supra*, 530 U.S. at p. 490.)

In a recent decision, issued after briefing had been completed in this matter, the United States Supreme Court determined that facts that increase a mandatory minimum sentence must be submitted to the jury. (*Alleyne v. United States* (2013) 570 U.S. __ [133 S.Ct. 2151] (*Alleyne*).) In so holding, the court overruled its earlier contrary decision in *Harris v. United States* (2002) 536 U.S. 545.[17]

In *Alleyne*, the jury convicted the defendant of robbery affecting interstate commerce (18 U.S.C. § 1951(a)) and using or carrying a firearm in relation to a crime of violence (18 U.S.C. § 924(c)(1)(A)). Using or carrying a firearm subjects an offender to a term not less than five years, brandishing the firearm subjects an offender to a term not less than seven years, and discharging the firearm subjects an offender to a term not less than 10 years (18 U.S.C. § 924(c)(1)(A)(i)-(iii)). More specifically, the jury's verdict indicated the defendant had used or carried a firearm during the commission of the offense. (*Alleyne*, *supra*, 133 S.Ct. at pp. 2155-2156.)

The presentence report recommended a seven-year sentence, which reflected the mandatory minimum sentence relative to an offender who had brandished a firearm during commission of the offense. Alleyne objected to the recommended seven-year term, contending it would violate his Sixth Amendment right to a jury trial as the jury did not find brandishing beyond a reasonable doubt. The district court, however, relied upon *Harris v. United States* in overruling Alleyne's objections, explaining that brandishing was a sentencing factor it could properly find by a preponderance of the evidence. Thus, it imposed the seven-year term. The court of appeals affirmed. (*Alleyne*, *supra*, 133 S.Ct. at p. 2156.) In reversing, the Supreme Court stated:

> "In *Apprendi*, we held that a fact is by definition an element of the offense and must be submitted to the jury if it increases the punishment above what

---

[17]A decision of the United States Supreme Court that results in a new rule will apply to all criminal cases still pending on direct review. (*Griffith v. Kentucky* (1987) 479 U.S. 314, 328.)

37.

is otherwise legally prescribed. [Citation.] While *Harris* declined to extend this principle to facts increasing mandatory minimum sentences, *Apprendi*'s definition of 'elements' necessarily includes not only facts that increase the ceiling, but also those that increase the floor. Both kinds of facts alter the prescribed range of sentences to which a defendant is exposed and do so in a manner that aggravates the punishment. [Citations.] Facts that increase the mandatory minimum sentence are therefore elements and must be submitted to the jury and found beyond a reasonable doubt." (*Alleyne*, *supra*, 133 S.Ct. at p. 2158.)

The *Alleyne* court held that "[d]efining facts that increase a mandatory statutory minimum to be part of the substantive offense enables the defendant to predict the legally applicable penalty from the face of the indictment." (*Alleyne*, *supra*, 133 S.Ct. at p. 2161.)

Subdivision (b) of section 186.22 concerns increased terms of imprisonment when the jury finds that a crime is committed for the benefit of a criminal street gang. When applicable, subdivision (b)(1) imposes an additional term of imprisonment when a defendant is convicted of a felony and the jury determines the crime was committed for the benefit of a criminal street gang. It begins by stating, "Except as provided in paragraphs (4) and (5), any person convicted of a felony" committed for the benefit of a criminal street gang shall receive the following sentence enhancements: (1) an additional term of two, three, or four years if only the enhancement is found true (§ 186.22, subd. (b)(1)(A)), (2) an additional term of five years if the felony is a serious felony as defined in section 1192.7, subdivision (c) (§ 186.22, subd. (b)(1)(B)), or (3) an additional term of 10 years if the felony is a violent felony as described in section 667.5, subdivision (c) (§ 186.22, subd. (b)(1)(C)). Subdivision (b)(2) and (3) of that section assists the trial court in determining which term of the sentencing triad should be imposed when the court has discretion to choose the additional term.

On the other hand, subdivision (b)(4) of section 186.22 requires the trial court to impose a term of life in prison instead of the sentence otherwise required by law for the following crimes: home invasion (§ 213), carjacking (§ 215), felony shooting at an inhabited building (§ 246), infliction of great bodily injury while discharging a firearm

38.

from a vehicle in the commission of a felony (§ 12022.55), "extortion, as defined in Section 519; or threats to victims and witnesses, as defined in Section 136.1." (§ 186.22, subd. (b)(4)(B), (C).)

When imposing the indeterminate term of life in prison, the trial court must choose a minimum sentence that is the greater of two alternatives. The first alternative is the term that would otherwise be imposed pursuant to section 1170 for the underlying conviction, including any enhancements. (§ 186.22, subd. (b)(4)(A).) The second alternative depends on the crime committed. The minimum term is 15 years if the crime is a home invasion (§ 213), carjacking (§ 215), felony shooting at an inhabited building (§ 246), or if the defendant inflicts great bodily injury while discharging a firearm from a vehicle in the commission of a felony (§ 12022.55). (§ 186.22, subd. (b)(4)(B).) The minimum term is seven years if the crime is "extortion, as defined in Section 519; or threats to victims and witnesses, as defined in Section 136.1." (§ 186.22, subd. (b)(4)(C).)

In sum, when a crime is committed for the benefit of a criminal street gang, subdivision (b) of section 186.22 requires the trial court to impose either (1) a term of imprisonment in addition to the term otherwise imposed by law, or (2) a life term with a minimum term of imprisonment determined as explained in the preceding paragraphs if the crime is specifically identified in subdivision (b)(4).

**B.     Analysis**

Count 5 charged defendants with dissuading a witness in violation of section 136.1, subdivision (b)(1), by unlawfully attempting to prevent and dissuade A.T. from reporting a crime to law enforcement. Count 1 charged defendants with extortion in violation of section 518. It was further alleged as to both counts that defendants committed the offenses "for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members." Additionally, it was alleged the offenses caused "the sentencing to be pursuant to section 186.22(b)(4)."

The verdicts found defendants guilty of "Dissuading a Witness From Reporting a Crime, to wit [A.T.], a violation of … Section 518 [*sic*: 136.1, subd. (b)(1)]" as charged in count 5.  The jury also found the enhancement true:  "We, the Jury, further find to be true the special allegation that said offense was COMMITTED FOR THE BENEFIT OF, AT THE DIRECTION OF, OR IN ASSOCIATION WITH A CRIMINAL STREET GANG …."  The jury returned a guilty verdict on count 1 that read:

> "We, the Jury, find the Defendant guilty as charged in Count 1 of the First Amended Information, to Extortion by Threat or Force of [A.T.], a violation of … section 518 which occurred on or about January 31, 2010.

> "We, the Jury, further find to be true the special allegation that said offense was COMMITTED FOR THE BENEFIT OF, AT THE DIRECTION OF, OR IN ASSOCIATION WITH A CRIMINAL STREET GANG, within the meaning of … sections 186.22(b)."

The trial court imposed sentences of 14 years to life for the convictions as charged in count 5 and count 1.  The base term was seven years to life, which was doubled because each defendant had suffered a prior "strike" conviction within the meaning of section 667, subdivision (e).

In this case, the trial court relied on subdivision (b)(4)(C) of section 186.22 to impose terms of seven years to life.  Imposition of this sentence is permissible only if defendants were convicted of "extortion, as defined in Section 519; or threats to victims and witnesses, as defined in Section 136.1."  (*Ibid.*)

## C.    The Terms Imposed for Witness Intimidation

Defendants argue they were convicted only of attempting to dissuade a witness from reporting a crime, rather than attempting to dissuade a witness from reporting a crime with threats.  The People assert that because the phrase "threats to victims and witnesses" refers to section 136.1, any conviction pursuant to this section permits imposition of the indeterminate sentence of life with a minimum term of seven years.

Subdivision (b)(1) of section 136.1 provides that anyone who attempts to prevent or dissuade another person who has been the victim of a crime from reporting a crime to

40.

law enforcement is guilty of an offense that may be punished as either a misdemeanor or a felony.  It also specifically names subdivision (c) as an exception to its provisions.

By comparison, subdivision (c) of section 136.1, in relevant part, provides that every person who commits an act described in subdivision (b) where the act is accompanied by force or by an express or implied threat of force is guilty of a felony punishable by imprisonment for two, three, or four years.  Accordingly, a defendant who attempts to dissuade a witness from reporting a crime is guilty of either a misdemeanor or a felony, but, if the defendant's attempt is accompanied by an express or implied threat of force, the defendant is then guilty of a felony with an increased term of imprisonment.

As explained above, defendants were alleged to have violated section 136.1, subdivision (b)(1), attempting to dissuade a victim of a crime from reporting a crime to law enforcement.  The amended information did not charge defendants with using an express or implied threat of force.  The instructions also did not inform the jury it must find defendants used an express or implied threat of force.[18]  Nor did the jury make a specific finding the defendants used an express or implied threat of force.  This is the exact factual setting in *People v. Lopez* (2012) 208 Cal.App.4th 1049, 1065, where we held:

> "Section 186.22, subdivision (b)(4)(C) permits imposing a sentence of seven years to life only if the defendant makes 'threats to victims and

---

[18]The jury instruction on count 5 was read to the jury as follows:  "The defendants are charged in Count 5 with intimidating a witness in violation of … Section 136.1.  [¶] … [¶] To prove that a defendant is guilty of this crime, the People must prove that:  [¶] One, the defendant maliciously tried to encourage [A.T.] from making a report that he or she was the victim of a crime to any peace officer or state or local law enforcement officer.  [¶] And, two, [A.T.] was a crime victim.  [¶] And, three, the defendant knew he was trying to discourage [A.T.] from causing arrest or causing prosecution, and intended to do so.  [¶] A person acts maliciously when he or she unlawfully intends to annoy, harm, or injure someone else in any way, or intends to interfere in any way with the orderly administration of justice.  [¶] As used here, witness means someone … who knows about the existence or nonexistence of facts relating to a crime.  [¶] A person is a victim if there's reason to believe that a federal or state crime is being or has been committed or attempted against him or her.  [¶] It is not a defense that the defendant was not successful in preventing or discouraging the victim.  It is not a defense that no one was actually physically injured or otherwise intimidated."

41.

witnesses, as defined in Section 136.1.' Only subdivision (c)(1) of section 136.1 refers to the use of an implied or express threat. Therefore, the plain meaning of section 186.22, subdivision (b)(4)(C) is that a seven-year-to-life sentence can be imposed only if the jury convicts the defendant of attempting to dissuade a witness by use of an implied or express threat of force pursuant to section 136.1, subdivision (c)(1)."

The People assert that the holding in *People v. Neely* (2004) 124 Cal.App.4th 1258 permits the sentence imposed because the reference to section 136.1 in section 186.22, subdivision (b)(4)(C) is not limited to any particular subdivision of that section and should be construed as including all the offenses set forth in section 136.1. We do not agree. In *Neely*, the defendant contended his prior conviction of violating section 136.1, subdivision (a)(2) did not qualify as a serious felony under section 1192.7, subdivision (c)(37). (*People v. Neely*, *supra*, at p. 1261.) Section 1192.7, subdivision (c)(37) defines "intimidation of victims or witnesses, in violation of Section 136.1" as a serious felony. Noting that none of the specific offenses in section 136.1 mentions "intimidation," *Neely* concluded that the phrase "intimidation of victims or witnesses" in section 1192.7, subdivision (c)(37) constituted a shorthand description of section 136.1 generally. (*People v. Neely*, *supra*, at p. 1266.) Unlike section 1192.7, subdivision (c)(37), however, section 186.22, subdivision (b)(4)(C) cannot be construed as a shorthand description of section 136.1 in its entirety. The requirement of force or threat in section 136.1 is particularly limited to a violation of subdivision (c) that expressly and unambiguously creates a statutory distinction between offenses that require force or threat and offenses that do not.

Although the intent of section 186.22, subdivision (b)(4) is to increase the punishment for gang-related crimes,[19] we cannot overlook the clear and unambiguous language of both section 186.22, subdivision (b)(4)(C) and section 136.1.

Defendants were not convicted of violating section 136.1, subdivision (c)(1). The jury did not find defendants used an implied or express threat of force in committing the

---

[19]See *People v. Galvez* (2011) 195 Cal.App.4th 1253, 1256.

42.

crime.  Therefore, the trial court erred in imposing a sentence of seven years to life pursuant to section 186.22, subdivision (b)(4)(C) because the section did not apply to the crime of which defendants were convicted and because the sentences imposed were based on a fact not found true by the jury.  (*People v. Lopez, supra*, 208 Cal.App.4th at pp. 1064-1065.)  We will vacate the sentences imposed pursuant to count 5 and remand the matters to the trial court for resentencing on that count.

### D.    The Terms Imposed for Extortion

Similarly, defendants contend the life terms imposed for the extortion convictions are not authorized because the jury did not find the crime of extortion was committed by means of fear induced by threat.  They further argue the errors are not harmless.

In the first amended information, defendants were charged, in pertinent part, as follows:

> "COUNT 1 [¶] On or about January 31, 2010, in the County of Tulare, the crime of EXTORTION, in violation of … SECTION 520, a FELONY, was committed by [defendant] WOLFE and [defendant] ANAYA, who did unlawfully extort money and other property from A.T., by means of force and threat such as is mentioned in Section 519."

The jury was instructed with CALCRIM No. 1830, Extortion by Threat or Force.[20]

---

[20]"The defendants are charged in Count ONE with extortion by threat or force in violation of … section 518.

"To prove that a defendant is guilty of this crime, the People must prove that:

"1.  The defendant threatened to unlawfully injure or used force against another person or a third person;

"2.  When making the threat or using force, the defendant intended to use that fear or force to obtain the other person's consent to give the defendant money or property;

"3.  As a result of the threat or use of force, the other person consented to give the defendant money or property;

"AND

"4.  As a result of the threat or use of force, the other person then gave the defendant money or property.

"The term *consent* has a special meaning here.  Consent for extortion can be coerced or unwilling, as long as it is given as a result of the wrongful use of force or fear.

43.

As previously noted, section 518 defines extortion as the "obtaining of property from another, with his consent … induced by a wrongful use of force or fear." Section 519 defines fear for purposes of the crime of extortion: "Fear, such as will constitute extortion, may be induced by a threat …: [¶] 1. To do an unlawful injury to the person or property of the individual threatened." With regard to punishment for the crime of extortion, section 520 provides as follows:

> "Every person who extorts any money or other property from another, under circumstances not amounting to robbery or carjacking, by means of force, or any threat, such as is mentioned in Section 519, shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 for two, three or four years."

Essentially, on appeal defendants argue that because the verdict forms specifically referenced section 518, rather than section 519, the sentences imposed are unauthorized. Defendants argue there exists a distinction between "means of force" and "means of a threat" for purposes of the applicability of either subdivision (b)(1)(C) or (b)(4)(C) of section 186.22.

Defendants were alleged to have committed the crime of extortion pursuant to section 518, although the information specifically references sections 519 and 520. Section 518 requires a finding of the use of force or fear induced by threat. The jury was instructed with CALCRIM No. 1830, which expressly provided the People must prove the defendants "threatened to unlawfully injure or used force" and "[w]hen making the threat or using force, the defendant intended to use that fear or force" to obtain consent, and that as "a result of the threat or use of force, the other person consented to give the defendant money or property," and that as a result of that same "threat or use of force" the victim gave the defendant money or property. The jury's verdicts found defendants

---

"The threat or use of force must be the controlling reason that the other person consented. If the person consented because of some other controlling reason, the defendant is not guilty of extortion.

"The threat may involve harm to be inflicted by the defendant or by someone else."

44.

guilty "as charged in Count 1 of the First Amended Information," "Extortion by Threat or Force … a violation of … section 518 …." Here, too, the jury did not make the required factual findings pertaining to fear necessary to permit the trial court to impose the alternative sentence pursuant to section 186.22, subdivision (b)(4)(C).

A punishment of seven years to life is authorized "if the felony is extortion, as defined in Section 519." (§ 186.22, subd. (b)(4)(C).) We are not convinced, as argued by the People, that specific reference to section 519 instead of section 518 is a legislative oversight. Rather, the plain language of section 186.22, subdivision (b)(4)(C) is that it applies to criminal street gang threats that induce fear, such as will constitute extortion, "as defined in Section 519; or threats to victims and witnesses as defined in Section 136.1." It seems clear that this subdivision seeks to impose longer imprisonment for felony convictions for extortion and witness/victim intimidation when they are committed by criminal street gang members using felonious threats to commit these felonies. For that reason, we are also not persuaded by the People's assertion that defendants' interpretation of the statute is one that the "Legislature cannot have intended" for it would lead to "an absurd result." As defendants contend in their reply brief, reserving the seven years to life term for the crime of extortion that involves a threat comports with the Legislature's desire to punish that threat more harshly. The use of force only, on the other hand, could amount to nothing more than a battery. Therefore, we believe the Legislature intended extortion committed via a felonious threat to be treated more harshly than extortion by simple force.

Under *Apprendi*, the court could not properly impose sentences under this statute without findings by the jury that the elements were met. Because the jury was instructed on extortion under two theories—force or fear—and was not required to find that the extortion was based on threats inducing fear, it did not necessarily find this element true when it rendered its verdicts in count 1.

We cannot say the error in sentencing the defendants under section 186.22, subdivision (b)(4)(C) was harmless beyond a reasonable doubt. Without a specific

45.

finding, we can only speculate which theory the jury accepted as true, or whether it accepted both theories. If we were to engage in such speculation, however, we would conclude it is unlikely the jury found the extortion conviction based on a threat inducing fear. Instead, the evidence established that the victim handed over the money in his possession after one of the perpetrators punched him in the face. This was also the theory the People argued to the jury. Consequently, the sentences imposed on count 1 must be vacated and the matter remanded for resentencing under section 186.22, subdivision (b)(1)(C).

###### E.    The Gang Enhancement Regarding the Burglary Conviction

In sentencing defendant Wolfe, the trial court imposed the following on count 2:

> "In the Count 2, he's committed to state prison for the midterm of eight years plus an additional consecutive ten years pursuant to Section 186.22(b)(1)(c) … for a total of 18 years …. That is stayed pursuant to … Section 654."

With regard to defendant Anaya, the trial court stated the following when imposing its sentence for burglary:

> "In Count 2, he is committed to state prison for the midterm of 8 years with an additional and consecutive 8 [*sic*: 5] years pursuant to section 667(a)(1) … for a total of 13 years with the same credits. This however is stayed pursuant to … Section 654."

Following a discussion held off the record during sentencing proceedings for defendant Anaya, the trial court also stated:

> "… In Counts 1, 2, 4, 6 and 7, there are references either to findings that [defendant] Anaya was found guilty of and/or was sustained by the jury to be in violation of … Section 667.5(B) or 186.22(b)(1)(c), all of those punishments are stayed and are not being added in any fashion to the aggregate sentence to [defendant] Anaya.
>
> "It is my intent to stay those allegations just as I stayed any of the other underlying crimes that were made clear on the record. [¶] … [¶] … In those counts where I stayed the punishment they will also be stayed."

The abstracts of judgment each reflect the gang enhancements and all but one of the prior conviction enhancements were stayed.    Defendant Anaya argues the trial court "did not

46.

orally impose any gang enhancement to the term for the burglary conviction," and therefore the "matter should be remanded for the trial court to either impose and stay a gang enhancement on the burglary conviction, or to state the reason(s) for striking the enhancement."

The general rule is that when there is a discrepancy between the oral pronouncement rendering judgment, as reflected in the reporter's transcript, and the minute order or the abstract of judgment contained in the clerk's transcript, the oral pronouncement controls. (*People v. Mesa* (1975) 14 Cal.3d 466, 471-472, superseded by statute on other grounds in *People v. Turner* (1998) 67 Cal.App.4th 1258, 1268; *People v. Crenshaw* (1992) 9 Cal.App.4th 1403, 1415-1416.)

Despite defendant Anaya's claim to the contrary, we perceive no discrepancy here. It is plain from this record that the trial court intended to, and did, stay imposition of the applicable gang enhancement on this count. Thus, there is no reason to remand the matter to the trial court on this issue.

F.    **The Prior Serious Felony Conviction and Prior Prison Term Enhancements**

1.    *Defendant Anaya*

Defendant Anaya contends, and the People concede, the trial court improperly imposed multiple prior serious felony and prior prison term enhancements. Specifically, defendant Anaya asserts that while he admitted one prior serious felony conviction and having served a prior prison term, imposition of a five-year enhancement on counts 4, 6 and 7 is not authorized. Additionally, he contends because only one prior prison term was admitted, "only one stayed prior prison term enhancement is authorized."

In this case, the trial court sentenced defendant Anaya to indeterminate terms on counts 1, 2 and 5:  30 years to life plus five years for the prior serious felony on count 3 (§ 211); 14 years to life plus five years for the prior serious felony, to run concurrent, on count 5 (§ 136.1); and 14 years to life plus five years for the prior serious felony, stayed

pursuant to section 654, on count 1 (§ 518). With regard to determinate terms, the trial court imposed the following:

> "In Count 2, he is committed to state prison for the midterm of 8 years with an additional and consecutive 8 [*sic*: 5] years pursuant to section 667(a)(1) … for a total of 13 years with the same credits. This however is stayed pursuant to … Section 654.

> "Count 4, he is committed to state prison for the midterm of 4 years with an additional and consecutive 5 years pursuant to … Section 667(a)(1) … for a total of 9 years with the same credits. The punishment is stayed pursuant to … Section 654.

> "Count 6, he is committed to state prison for the midterm of 4 years with an additional and consecutive 5 years pursuant to section 667(a)(1) … with a total of 9 years with the same credits. This punishment is stayed pursuant to … Section 654.

> "In Count 7, he is committed to state prison for the midterm of 4 years with an additional consecutive 5 years pursuant to … Section 667(a)(1) for a total of 9 years with the same credits. [P]unishment however is stayed pursuant to … Section 654."

A short time later, the trial court stated: "In Counts 1, 2, 4, 6 and 7, there are references either to findings that [defendant] Anaya was found guilty of and/or was sustained by the jury to be in violation of … Section 667.5(B) or 186.22(b)(1)(c), all of those punishments are stayed and are not being added in any fashion …"

Defendant Anaya contends that where the prior serious felony and prior prison term enhancements were applied to determinate terms more than once—even where they were ultimately stayed pursuant to section 654—the trial court erred. Thus, he asserts the abstract of judgment must be corrected to reflect imposition of the section 667, subdivision (a)(1) enhancement only as to the determinate term on count 2. We agree and accept the People's concession. We hold the trial court should not have imposed more than one prior serious felony enhancement; thus, it could not have imposed that enhancement on the determinate terms imposed on counts 4, 6 and 7. With regard to the section 667.5, subdivision (b) enhancement, the prior prison term enhancement should be imposed but once where appropriate. Defendant Anaya admitted serving one prior prison

48.

term, hence, his sentence could only be enhanced by one year, one time. Nevertheless, the abstract of judgment lists the enhancement seven times separately, stayed pursuant to section 654. These enhancements instead should be stricken. (*People v. Perez* (2011) 195 Cal.App.4th 801, 805 ["trial court erred in imposing both a consecutive five-year enhancement under section 667, subdivision (a)(1) for the felony conviction which gave rise to the prior prison term and the one-year enhancement under section 667.5, subdivision (b) for that prior prison term"].) We shall order the abstract of judgment be amended accordingly.

### 2. *Defendant Wolfe*

A review of the sentencing proceedings related to defendant Wolfe reveals the abstract of judgment issued as to him must also be corrected.

Following the jury's verdicts, and in a separate bifurcated proceeding, it was found true that defendant Wolfe had suffered a prior strike (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and serious felony (§ 667, subd. (a)(1)), to wit: an October 2008 conviction for assault with a deadly weapon (§ 245, subd. (a)(1)).

Thereafter, at a later sentencing proceeding, the trial court's oral pronouncement referenced the section 667, subdivision (a)(1) enhancement on a single occasion: "In Count 3, he is committed to state prison for the indeterminate term of 30 years to life with an additional consecutive five years pursuant to Section 667(a)(1) … for a total of 35 years to life." The trial court made no further mention of a section 667, subdivision (a) enhancement as to any other count. Nevertheless, the abstract of judgment references three separate stayed enhancements pursuant to that code section regarding the determinate terms imposed. These references must be deleted. Similar to our finding regarding defendant Anaya, we hold the trial court should not have imposed more than one prior serious felony enhancement.

## IV. The Receiving Stolen Property Conviction

Defendants contend they cannot be properly convicted of both robbery and receiving stolen property. The People agree the convictions must be reversed.

Section 496, which makes receipt of stolen property unlawful, also provides that "no person may be convicted both pursuant to this section and of theft of the same property." (§ 496, subd. (a).) Generally speaking, a defendant may not be convicted of stealing and receiving the same property. (*People v. Jaramillo* (1976) 16 Cal.3d 752, 759.)

Here, the first amended information alleged the crimes of home invasion robbery in violation of section 211 and of receiving stolen property in violation of section 496. With regard to the robbery count, it was alleged defendants took "personal property from the person, possession and immediate presence of A.T." The specific property was not identified as to this count. However, the receiving stolen property count specifically referenced "COMPUTER EQUIPMENT." In his closing argument, the prosecutor argued as follows:

> "Count 3, robbery.… [¶] The computers were taken by robbery. There was force or fear utilized by [defendant] Wolfe, by [defendant] Anaya …. And they went into his bedroom and they took his computers. … They didn't have his permission to have those computers."

Thus, the property alleged as to the robbery count is the same property referenced in the receiving stolen property count. As a result, defendants were wrongly convicted of both stealing and receiving the same property and reversal is required. (Cf. *People v. Ceja* (2010) 49 Cal.4th 1, 3-4 [theft conviction operates as bar to conviction of receiving same property, and where defendant has been convicted of both offenses in violation of this rule, receiving stolen property conviction must be reversed].)[21]

Accordingly, we will reverse defendants' convictions for receiving stolen property. In light of this finding, we find it unnecessary to address defendants' separate argument regarding the punishment imposed for these convictions.

---

[21]Counsel for defendant Wolfe argued as much during the sentencing proceedings held November 30, 2011.

## V.     The Juror Misconduct Claim

Defendants contend the judgments must be reversed because a juror engaged in prejudicial misconduct.  More specifically, defendants assert the juror committed misconduct by speaking to her father about fear she experienced as a result of the purported actions of an audience member, and by discussing same with her fellow jurors.  The People assert there was no misconduct and that, in any event, there was no substantial likelihood any juror was biased against defendants.

### A.     The Relevant Background

On the fourth day of trial, the court convened in chambers to discuss an issue brought to its attention regarding a juror.  The trial court explained that another judge was approached by a friend who advised his daughter was serving as a juror on a gang case.  The individual relayed that his daughter was afraid or fearful because a female audience member watched her as she took notes.  The court was not certain the juror was in fact seated on its particular jury, but sought feedback from counsel.  The prosecutor volunteered that he was aware the action was "the only gang trial" ongoing; counsel for defendant Wolfe, Mr. Reyes, was of a similar understanding.  Thus, it was suggested an inquiry be made of the juror regarding her fear and the communication of that fear.  The court agreed to do so after noting it had not witnessed any inappropriate behavior on the part of any audience member.  Specifically, the court noted the presence of a female audience member—later determined to be the mother of defendant Wolfe's girlfriend— who "simply sat there and watched the proceedings."

Thereafter, Juror 104 was questioned as follows:

> "JUROR 104:  I am 30 years old and my dad is still calling people isn't he?
>
> "THE COURT:  Good morning to you.
>
> "JUROR 104:  Good morning.

51.

"THE COURT: We are all convened and out of the presence of the jury panel except for juror number 104. All 3 lawyers in this case are present along with court staff.

"First and foremost we are not here to punish you or embarrass you in any way, I want to make sure you understand that.

"JUROR 104: Uh-huh.

"THE COURT: But by your comment as you come through the door I think you have some idea why I have to talk to you.

"JUROR 104: Uh-huh, yeah.

"THE COURT: It has been reported to me through a channel that perhaps through and if the persons are wrong you are going to correct me, a father in law or a father.

"JUROR 104: Father.

"THE COURT: Indicated that you spoke with him.

"JUROR 104: Uh-huh.

"THE COURT: Regarding, I am going to say what I heard.

"JUROR 104: Okay.

"THE COURT: That you are feeling fearful in this case because you believe some one in the audience is staring at you while taking notes.

"JUROR 104: Uh-huh.

"THE COURT: And that's the end and all of what I heard.

"JUROR 104: Uh-huh. I just wasn't sure if—

"THE COURT: Let me real quick. So first of all I want to confirm that you did make that comment to a relative, is that correct?

"JUROR 104: Uh-huh, my father.

"THE COURT: Your father?

"JUROR 104: Yes.

"THE COURT: Did you say anything else to him?

52.

"JUROR 104: No.

"THE COURT: All right. Did you talk to him about the facts of the case?

"JUROR 104: No.

"THE COURT: Did you discuss it with anybody else except your father?

"JUROR 104: My husband and my father were there.

"THE COURT: Okay. Did you express that sentiment to any other juror members?

"JUROR 104: No, it has been discussed in there that that feeling of feeling threatened or you know, nervous being in the situation, being the type of case that it is, just, and the one particular audience member, you know, we have all noticed.

"THE COURT: Who is the person that you—

"JUROR 104: It is a lady, she was in an orange shirt yesterday, long hair, there was only a lady and a gentleman.

"THE COURT: And what do you believe she is doing?

"JUROR 104: I have no idea because I don't know if she is part of a gang or—

"THE COURT: No. No, but you indicated you were fearful because she is doing something.

"JUROR 104: Just staring to me, to me she is like, okay is she going to—I am going to cry, I don't even want to be in here. I just feel like maybe—

"THE COURT: You know what, you are doing marvelously well. We will get you some Kleenex.

"JUROR 104: I don't want her to be telling somebody else or there is a girl in a blue and white dress and, you know, follow her or you know, whatever else. It is just scary any time you are dealing with something like that.

"THE COURT: Okay. I will say it again, you have done nothing wrong, okay?

53.

"JUROR 104: Uh-huh.

"THE COURT: I need to ask you, a couple of things come to mind based upon your statements. You say that several other members of the jury have expressed similar sentiment, is that correct?

"JUROR 104: Uh-huh, just a nervousness of the case and it, you know, not knowing if we are being, you are going to be watched or whatever else, you know what I mean?

"THE COURT: Yes. And have they expressed the same sentiment with respect to somebody in the audience or related to the defendant in the case?

"JUROR 104: No. Audience.

"THE COURT: Anybody else besides that woman?

"JUROR 104: Another person said that the gentleman, I didn't ever pay attention to the man because to me he was always looking forward, but the lady, I felt like every time I looked up her eyes were just right in the juror box, you know, paying attention to us.

"THE COURT: The only word I know is dogging, do you feel like she is dogging you?

"JUROR 104: Yes. I mean in a sense it was rude to me, I thought she was loaded out of her mind, you know, so just, I felt very uncomfortable.

"THE COURT: And other jurors have expressed the same?

"JUROR 104: Uh-huh.

"THE COURT: I am not calling you back in here to—

"JUROR 104: I want you to know that I am enjoying this, like when my dad, called him, today I called him, but I mean I am doing it but there is just that aspect of the case.

"THE COURT: All right. I am not going to ask you to rat out any individual members but I need to know. You have said generally several people have expressed that.

"JUROR 104: Uh-huh.

"THE COURT: Approximately how many?

54.

"JUROR 104: I would say 2 or 3. I mean other people have maybe talked off of it but 2 or 3 have directly.

"THE COURT: So you would say several?

"JUROR 104: Uh-huh.

"THE COURT: I need to ask you is there anything about the trial, is there anything about the attorneys' conduct or what they have said, is there anything about the way that the case has been conducted, setting aside this woman.

"JUROR 104: Uh-huh.

"THE COURT: That is causing you to be fearful?

"JUROR 104: Not at all.

"THE COURT: So nothing else at all.

"JUROR 104: No.

"THE COURT: And whether any reports or any comments made to your knowledge by anybody else in the jury panel when you are talking or otherwise that related a fear or concern outside this woman that you have identified?

"JUROR 104: No, I think just seeing that, the woman in there and the man, it makes them fearful that then you know that they could be following us or something like that, we know that the defendants and the other people are on lock down. I don't know that but, you know what I mean, that they are watched and I am not afraid of them. I am not. To me those people walk out the same time I may walk out and you know, I mean I walked around before I walked to my car and you know, I don't want any of that.

"THE COURT: All right. If I will assure you and assure everybody in the jury that we will take extra precautions to make sure that you will not have contact with people in the audience who you believe, I have no idea who this woman is. Oh, that is not true. I have an idea now because one of the attorneys suggested they may know who that person is.

"JUROR 104: Uh-huh.

"THE COURT: But so that you will not have contact with anybody in the audience when you come into and leave court on recess or otherwise, but you believe that would make you feel more comfortable.

55.

"JUROR 104:  Yeah, because there is no way to insure that that person can't be, because it is open to the public, right?

"THE COURT:  Sure.

"JUROR 104:  That is where you are just screwed, I mean I don't know.

"THE COURT:  I have to say something.  I have asked questions, I'm going to say something.  I guess I am the only person whose got a straight on view of the audience and although my attention is appropriately and properly focused on the witnesses or the lawyers, I look up at the audience dozens of times.  I have not seen anybody act or say or do anything inappropriate.

"JUROR 104:  Uh-huh.

"THE COURT:  My job is to call that immediately and I would get on somebody immediately even if I felt there was the hint of that.

"JUROR 104:  Uh-huh.

"THE COURT:  And I haven't seen anything so I want to assure you it is not like I am oblivious to that or that is not something that I am always concerned about in any case.

"JUROR 104:  Uh-huh.

"THE COURT:  I also will recommunicate with you what I did in the jury panel initially that there is nothing specific about this case that is different than a case we did last week and the case we did next week, somebody is charged with crimes.

"JUROR 104:  Uh-huh.

"THE COURT:  And this is the process that we used and if I felt otherwise I would be up front with everybody.  I would not want you to be in a situation different than a friend of mine or a relative or otherwise, and I want you to hear that from me.  Okay?

"JUROR 104:  Okay.

"THE COURT:  Counsel, are there any questions that you would like me to address with juror number 104 before she is excused back to the jury room?

"MR. REYES:  No, Your Honor[.]

56.

"THE COURT:  Mr. Meyer.

"MR. MEYER:  No, Your Honor.

"THE COURT:  Mr. Bartlett?

"MR. BARTLETT:  No.  Thank you.

"THE COURT:  Thank you ma'am.  Thank you for your honesty.

"JUROR 104:  Uh-huh.

"(Juror 104 leaves chambers.)

"THE COURT:  We remain on the record.  Gentlemen, any comments?

"MR. BARTLETT:  I feel that I need to discuss this with my client.  I would like to just take a 2 to 5-minute break.  Let him—

"THE COURT:  You know what I should have said?  Could you have her come back here again?  I need to tell her not to talk about what we just talked about.

"[PROSECUTOR]:  Can we have a discussion off the record?

"(Juror 104 returns to chambers.)

"JUROR 104:  I was going to let you know she is out there today, just far left.

"THE COURT:  All right.  I am supposed to tell you please do not, remember the admonition, please do not discuss this conversation with any other members of the jury.

"JUROR 104:  Okay.

"THE COURT:  Thank you.

"JUROR 104:  You got what I said?

"THE COURT:  I did.

"(Juror 104 leaves chambers.)

"THE COURT:  Do you want to go off the record, gentlemen?

"[PROSECUTOR]:  Yeah.

57.

"(Discussion held off the record.)"

The court then broadened its inquiry by questioning each remaining juror separately. Juror Nos. 122, 35, 110, 107, 27, 116, 46, 132, 11, 120 and 124 indicated they were not fearful and that nothing had happened during the trial to cause them fear. Some had heard other jurors discuss concerns about an audience member staring at the jury. Others had not personally perceived such action by the audience member. Each one indicated he or she could remain fair and impartial. Juror No. 18 admitted being a little unnerved by a woman in the audience who was staring the day prior, but indicated she could be fair and impartial. Juror No. 123 indicated that a spectator caused her to be fearful because the spectator "intensely watch[ed]—the jury." She was uncomfortable because she felt she was being stared at. She did not discuss her fear with others, but had overheard other jury members expressing their concerns. Despite being a little nervous, she believed she could be fair and impartial. Juror No. 27 understood another juror's concern to involve her fear walking to a ballgame, and agreed with the trial court that the fear was the result of "her attention perhaps is heightened because of what's going on here …."

Once the jurors were excused, the court noted it had "voir dired each and every member of the jury panel and the 2 remaining alternates. Each and every member of the jury panel after discussion has fully and freely represented that they remain and are still able to be a fair and impartial jurors [*sic*] in this case and render a decision according to the instructions and the law …." The court was of the opinion that "nothing has transpired in this case that has sacrificed the due process, procedural, statutory and other constitutional rights" of defendants. It then invited comment from counsel. At the request of counsel for defendant Anaya and with the stipulation of counsel for defendant Wolfe and the People, an unreported discussion was held in chambers. When proceedings resumed, the jury was present. The issue was briefly noted before the jury was released on noon recess. Shortly thereafter, counsel for defendant Wolfe moved for a mistrial:

58.

"MR. REYES:  I make a motion for mistrial, Your Honor.

"THE COURT:  On what basis?

"MR. REYES:  On the basis that in my opinion the jury in general has been tainted by everything we discussed this morning.  The specific comment that concerns me at the end was that one of the jurors and in the individual questioning on him had indicated that some one had mentioned something in addition to which was a statement that one of the jurors had made a comment about being afraid when they went to the ball game last night, walking at the ball game.  None of the jurors made that comment.  That they in fact had said that to the other jurors.

"So obviously on top of what already has been going on there is clearly feelings, comments that are being made, they are not, that were not disclosed to us when we did the voir dire concerning that specific issue and that to me raises a m[o]re serious concern is that they are not being forthcoming let's say with their total feelings.

"And I understand that each of them have said yes, they can be fair and impartial jurors, but based on the taint that has already happened I just feel this point that edge in terms of fairness has just been tilted and at this point I don't feel my client can have a fair trial.

"THE COURT:  Mr. Bartlett, do you wish to be heard?

"MR. BARTLETT:  On behalf of [defendant] Anaya we will join in the request and comments of Mr. Reyes.

"THE COURT:  Mr. Meyer, do you wish to be heard on the record?

"MR. MEYER:  Based on Mr. Reyes did acknowledge that we individually pulled each juror on the record after a questioning, they acknowledged that they could still be fair and impartial jurors and that any concern they had was extraneous to any facts or evidence that have been presented in this case thus far, rather it was a civilian who was watching the trial and they said that they could essentially remove that from their head and still judge this trial fairly and impartially.

"THE COURT:  I can't imagine how I could have been more exhaustive in terms of the supplemental voir dire of this jury panel.  We took about an hour and a half to individually question each and every juror, had to do with their own personal experience and the experience and participating in or listening to conversation.

59.

"Not one juror expressed any concern or opinion that they would not be able to fulfill their duties in this case. Not one juror changed their representation to you and to this court that they would be fair and impartial and wait until all the evidence is in before making a decision. Not one juror said that he or she would be influenced in any way by this very relatively small issue. And I will not repeat what's been talked about.

"But the one juror allegedly talked to her father without identifying the case, without discussing the facts of this case and most importantly without getting any input from outside this court proceeding about her job or about the facts relaying what she relayed. This jury pool has not been tainted by anything that has happened outside this courtroom and quite frankly, other than what has been thoroughly discussed nothing that has gone on in this courtroom.

"The comment that you related to or mentioned, Mr. Reyes, I think is simply one that was reflected by I don't remember her number, the juror who came in and said she and perhaps other jurors are concerned I think the quote was no more than they were at the beginning given the nature of the charges of this case and the comment about walking to a baseball park and being concerned wasn't tied at all to these defendants or anybody else in this process.

"I do understand the extended portion of your concern and that is nobody else relayed that information. But I don't believe that is a reflection take any one of these jurors are testifying under penalty of perjury wrongly or making misrepresents to this court about what has gone on and their ability to sit on the jury and be fair and impartial.

"All my questions lead up to them to the ultimate question to each juror and that is can you be fair and impartial in this case and each one to a person said that they could and would.

"I respect your opinion in all matters but however I must make a determination as to whether or not this jury has been tainted in any way or even the probability of that and I cannot find such given what we have done in this case and on that basis your motion is respectfully denied."

## B.    The Applicable Law

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is '"capable and willing to decide the case solely on the evidence before it"' [citations]." (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.)

"A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial. [Citation.]" (*People v. Bolden* (2002) 29 Cal.4th 515, 555.) "'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1068.) It is not an abuse of discretion when a trial court denies a motion for mistrial after being satisfied that no injustice has resulted and the party's chances of receiving a fair trial have not been irreparably damaged. (*People v. Eckstrom* (1986) 187 Cal.App.3d 323, 330.)

> "'When a trial court is aware of *possible* juror misconduct, the court "must 'make whatever inquiry is reasonably necessary'" to resolve the matter.' [Citation.] Although courts should promptly investigate allegations of juror misconduct 'to nip the problem in the bud' [citation], they have considerable discretion in determining how to conduct the investigation. 'The court's discretion in deciding whether to discharge a juror encompasses the discretion to decide what specific procedures to employ including whether to conduct a hearing or detailed inquiry.'" (*People v. Prieto* (2003) 30 Cal.4th 226, 274.)

Section 1089 "authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is 'found to be unable to perform his or her duty.'" (*People v. Bennett* (2009) 45 Cal.4th 577, 621.) "Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged. [Citation.]" (*People v. Espinoza* (1992) 3 Cal.4th 806, 821.) "Such an inquiry is central to maintaining the integrity of the jury system, and therefore is central to the criminal defendant's right to a fair trial." (*People v. Kaurish* (1990) 52 Cal.3d 648, 694.) Whether to remove the juror is left to the discretion of the trial court, whose decision for removal is reviewed by "asking whether the grounds for such removal

appear in the record as a demonstrable reality." (*People v. Thompson* (2010) 49 Cal.4th 79, 137.)

## C. Analysis

Here, as illustrated above, the trial court conducted an immediate and thorough inquiry into any potential juror misconduct. Juror No. 104 in particular was extensively questioned.

There was no prejudicial misconduct here. As established by the trial court's inquiry, Juror No. 104 did not talk to her father about facts relating to the case or even identify the particular case. Rather, she expressed only her fear of an audience member. A jury is instructed that it shall not converse about "any subject connected with the trial." (§ 1122, subd. (a)(1).) We find that an audience member or member of the public observing the trial proceedings is not a "subject connected with the trial." (See, e.g., *People v. Loot* (1998) 63 Cal.App.4th 694, 697 [prosecutor was a "subject connected with the trial" and thus juror's discussion of his personal life with nonjuror was misconduct].) For that same reason, Juror No. 104's conversations with other jurors about any fear perceived after having been stared at by a member of the audience—and even their own similar apprehension—is not a "subject connected with the trial." Moreover, Juror No. 104 specifically indicated that the fear she was expressing did *not* relate to defendants. She also indicated that nothing else that had occurred during the course of the trial served to cause her fear. The trial court was satisfied with Juror No. 104's responses, as well as the responses of the entire jury panel following its inquiry. Notably too, counsel for defendants did not ask additional questions of any panel member despite being given an opportunity to do so. Lastly, the trial court stated that it had not observed any troubling behavior by the spectator in question.

Here, following its exhaustive inquiry, the trial court noted that no juror expressed any concern that he or she would be unable to fulfill his or her duties, no juror indicated he or she was incapable of being fair and impartial or incapable of waiting until all the evidence had been admitted before making a decision, and no juror indicated he or she

would be influenced "in any way by this very relatively small issue."[22] As a result, the trial court concluded that the jury had not been "tainted in any way or even the probability of" having been tainted by the conduct of Juror No. 104 or her fellow jurors in conversing about the staring audience member. We defer to the observations and credibility determinations of the trial court. (*People v. Pride* (1992) 3 Cal.4th 195, 260.)

In *People v. Panah* (2005) 35 Cal.4th 395, the defendant's supporters "were following or 'shadowing' the jurors during breaks in their deliberations, while others, including his mother, were clustering near the jury while it was assembling on breaks." (*Id*. at p. 480.) The trial court reported that a juror had told the bailiff she was intimidated by the presence of these supporters. A male juror was overheard expressing relief that the jury did not have to assemble on a certain floor, "presumably to avoid contact with defendant's supporters." (*Ibid.*) The Supreme Court concluded that the jurors' "understandable concern [did] not amount to misconduct." There was no evidence the jury was biased against the defendant or that any bias affected the jury's deliberations, and nothing in the record supported the defendant's claim that he was denied an impartial jury. (*Ibid*.) We conclude similarly here. Following the trial court's thorough inquiry, there is no evidence the jury was biased against defendants or that any bias affected the jurors' deliberations, denying defendants the right to an impartial jury.

Defendants contend "the record contains no statement by juror #104 that despite her fears about the audience member, she could remain fair and impartial as a sitting juror," and that "a presumption that she would have confirmed her lack of bias would amount to sheer speculation." We agree with the former and disagree with the latter.

As evidenced by the quoted portion of the inquiry provided above, Juror No. 104 was not expressly asked whether she could remain fair and impartial. Nevertheless, it is

---

[22]The jury was instructed that it "must use only the evidence that was presented in this courtroom. 'Evidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence." Perceptions related to possible actions by members of the audience are not evidence to be considered by the jury.

not "sheer speculation" to conclude she would have confirmed her lack of bias had she been asked. During the proceedings concerning this incident, the trial court stated on several occasions that each juror said he or she could remain fair and impartial. Neither defense attorney objected to the accuracy of the court's statements. In fact, in arguing his motion for mistrial, attorney Reyes expressly acknowledged "that each of them have said yes, they can be fair and impartial jurors." The prosecutor reiterated this sentiment in arguing against the motion: "[W]e individually pulled each juror on the record after a questioning, they acknowledged that they could still be fair and impartial jurors." Given the foregoing comments and circumstances on this record, it is not speculation to conclude Juror No. 104 would have affirmed her ability to remain fair and impartial despite her apprehension concerning the audience member.[23]

Even assuming for the sake of argument misconduct occurred here, our high court has explained that

> "'before a unanimous verdict is set aside, the likelihood of bias under either test must be *substantial* …. [T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. The jury system is fundamentally human, which is both a strength and a weakness. [Citation.] Jurors are not automatons. They are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias. To demand theoretical perfection from every juror during the course of a trial is unrealistic.' [Citation.]" (*People v. Danks* (2004) 32 Cal.4th 269, 304 [unsolicited comments from one juror's "pastor, [another juror's] conversation with her pastor, and the introduction of the Bible passages to the jury room were misconduct, but … this misconduct was not prejudicial"].)

This record reveals only "imperfection short of actual bias." Among the factors to be considered when determining whether the presumption of prejudice has been rebutted are "'the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued.'" (*People v. Von Villas* (1992) 11 Cal.App.4th 175, 256.) The nature

---

[23]The audience member at issue apparently elected to forgo attending and observing future trial proceedings.

and seriousness of the assumed misconduct is minimal. Juror No. 104's mention to her father of her fear of an audience member, and the discussions had amongst a few of the panel members on the same subject, do not directly relate to the subject of the trial or even to defendants. The comments did not concern facts elicited during trial. Thus the nature and seriousness of any assumed misconduct is slight. A review of the entire record finds no reasonable probability of actual harm to defendants. Accordingly, we also find the trial court did not err in denying defendants' motion for mistrial.

## DISPOSITION

The convictions for receiving stolen property (§ 496, subd. (a); count 7) are reversed. Additionally, the matter is remanded for resentencing on count 5 (§ 136.1[24]) and count 1 (§ 518). The trial court is directed to amend the abstracts of judgment as follows: As to defendant Anaya, (1) only a single reference to the prior serious felony enhancement pursuant to section 667, subdivision (a) should appear (delete the subsequent five references) and (2) delete all references to the section 667.5, subdivision (b) enhancement. As to defendant Wolfe, delete the references to the prior serious felony enhancement in regards to the determinate terms imposed in counts 4, 6, and 7. In all other respects, the judgments are affirmed.

_____

PEÑA, J.

WE CONCUR:

_____

POOCHIGIAN, Acting P.J.

_____

FRANSON, J.

---

[24]We note the abstract of judgment for defendant Anaya incorrectly refers to the statute as section 136.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ADAM DANIEL ANAYA et al.,<br><br>    Defendants and Appellants. | F063835 & F064116<br><br>(Super. Ct. Nos. VCF232942C &<br>VCF232942A)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING, CERTIFYING OPINION FOR PUBLICATION**<br>**[No Change in Judgment]** |

**THE COURT:**

It is ordered that the opinion filed herein on October 7, 2013, be modified as follows:

1.  On page 44, the first sentence of the first paragraph beginning "As previously noted, section 518 defines as" is modified to delete the introductory clause so the sentence reads:

> Section 518 defines extortion as the "obtaining of property from another, with his consent … induced by a wrongful use of force or fear."

2.  On page 65, footnote 24 is modified by adding an additional paragraph:

> In a petition for rehearing, defendant Wolfe for the first time asks this court to remand the matter for resentencing on count 8. He notes the analysis applied to count 5 applies with equal force to count 8, which also charged a violation of section 136.1. Rather than grant the relief requested because the People have been given no opportunity to address this issue, we will direct the trial court on remand to consider the propriety of its sentence with respect to defendant Wolfe on count 8 in the first instance, in light of our discussion and analysis with respect to count 5.

3.  On page 65, under the heading Disposition, after the fourth sentence ending "terms imposed in counts 4, 6, and 7" add the following:

> Also as to defendant Wolfe, the trial court is directed to consider on remand for resentencing the propriety of the sentence imposed on count 8.  (See fn. 24, *ante*.)

There is no change in the judgment.  As modified, defendant Wolfe's petition for rehearing is denied.

The opinion in the above-entitled matter filed on October 7, 2013, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports with the exception of parts I., II., III.E., III.F., IV., and V., and it is so ordered.

_____
PEÑA, J.

WE CONCUR:


_____
POOCHIGIAN, Acting P.J.


_____
FRANSON, J.

67.